THE CLEVELAND ELECTRIC ILLUMINATING CO., APPELLANT,
*v.* PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.
CITY OF CLEVELAND, APPELLANT, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO ET AL., APPELLEES.
SIERRA CLUB, INC., APPELLANT, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as Cleveland Elec. Illuminating Co. v. Pub. Util.
Comm. (1975), 42 Ohio St. 2d 403.]

(Nos. 74-276, 74-272 and 74-156—Decided June 11, 1975.)

*Messrs. Squire, Sanders & Dempsey, Mr. John Lansdale, Mr. Alan P. Buchmann, Mr. James H. Woodring, Mr. Alan D. Wright* and *Mr. Harry G. Fitzgerald, Jr.,* for The Cleveland Electric Illuminating Co.

*Mr. Herbert R. Whiting,* director of law, *Mr. Robert D. Hart, Mr. William B. Schatz* and *Mr. James L. Harkins, Jr.,* for the city of Cleveland.

*Messrs. Weston, Hurd, Fallon, Sullivan & Paisley, Mr. Jerome S. Kalur, Messrs. Benesch, Friedlander, Mendelson & Coplan* and *Mr. Michael T. Honohan,* for Sierra Club, Inc.

*Mr. William J. Brown,* attorney general, *Mr. Keith F. Henley, Mr. Walter E. Carson* and *Ms. Cheryl H. Keith,* for appellee.

CORRIGAN, J. The appeal of The Cleveland Electric Illuminating Company will be considered first, followed by

the appeals of the city of Cleveland and the Sierra Club. The Cleveland Electric Illuminating Company will be referred to as the Company, the city of Cleveland as the City, the Sierra Club, Inc., as Sierra, and the Public Utilities Commission as the Commission.

### I A.
### REQUIRED RETURN FOR EQUITY PORTION OF RATE BASE.

In its first argument, the Company contends that the Commission, in determining the rate of return, failed to follow the holding in *Ohio Edison Co. v. Pub. Util. Comm.* (1962), 173 Ohio St. 478, expressed in paragraph five of the syllabus therein, which reads:

"What will represent a reasonable annual compensation for the use of the property included in the rate base of a public utility will be the amount per year of income therefrom that would be required to induce investors to provide an amount equal to the rate base for the securities (such as bonds and shares of stock) of a corporation owning the property included in the rate base and engaged in the business of providing the public utility services being rendered by that property."

The Company asserts that the "* * * Commission did not state or even suggest in its Opinion and Order herein that the 7.05% return allowed * * * is the amount required to induce investors to provide an amount equal to the rate base for the securities (such as bonds and shares of stock) of a corporation owning the property included in the rate base of * * * [the Company]." Specifically, the Company contends that the Commission erred: (1) In its determination of the required return for the equity portion of the rate base; (2) in including in the rate of return calculation a "zero component" representing deferred credits; and (3) in finding that the cost of the bond portion of the rate of return should be 6.5 percent.

As pertinent to the foregoing issues, the Commission's opinion and order reads:

"The two witnesses testifying as to a proper rate of

return, in recommending rates of return higher than 5.08%, implied that said rate was insufficient to provide CEI with reasonable compensation for the electric service rendered and this Commission so finds.

"The applicant's witness, Mr. Brooks, recommended allowance of a current cost of debt, as of the date certain, of 7.35%, a current cost of preferred equity, at the same date, of 7.90%, and an allowance of 11.75% as return on common equity. Applying these allowances to CEI's capital structure results in a recommended rate of return of 9.05%.

"Mr. Brooks arrived at substantially the same conclusion by employing three separate approaches, all of which involved an 'estimate' of the cost of common capital which in turn included a factor for 'investor expectation of growth in earnings' * * *.

"In utilizing a rather complex formula, Mr. Brooks made a basic 'judgment' of percentage of earnings growth rate arrived at by an 'evaluation' of the historic electric earnings growth rate and an 'evaluation' of earnings growth rates to produce bond coverage ratios 'barely sufficient to preclude deterioration in bond ratings * * *.' * * * Mr. Brooks recommended that a factor of 320 (reflecting investor expectation for growth in earnings) be added to the earnings price ratio adjusted for underpricing and commission cost, 8.55 to arrive at a current cost of capital of 11.75% * * *.

"Mr. Rothey, on the other hand, combined the average rate of growth in earnings of comparable electric utilities with the dividend yield to obtain an estimate of 11% as a proper investor discount rate for common stock. However, Mr. Rothey adjusted the 11% to eliminate the inflation factor, a calculation which he believed necessary in Ohio because the RCNLD rate base eliminates 'the eroding effect of inflation upon the value of an investment' * * *. The net result was an estimated cost of common capital of 8.5[%]. Mr. Rothey used the embedded cost of debt as of the end of the test year which was 6.5% * * *. The cost for the preferred stock of 7.4% represents the actual

amount on the $50,000,000 issue which occurred within the test year * * *.

"In addition, Mr. Rothey computed as a part of capital structure those amounts of funds representing the contributions in aid of construction account and the deferred credits account comprised of deferred investment credit and accumulated deferred income taxes. He predicated his theory upon the facts that 1) such funds are truly as much a part of a company's financing as funds generated from sale of stocks and bonds and 2) these funds are used to make permanent additions to the fixed plant and 3) these funds represent in effect interest free loans, which to be fair to the suppliers of the capital (the federal government and in reality tax paying consumers) should be included in the capital structure to prevent a positive return from being earned on assets which the funds represent * * *.

"The approaches of both witnesses are defensible; the cost of common capital can only be estimated; that estimation is supported only by 'evaluations' and 'judgments.' The results can never be tested scientifically. The selection of our expert's estimate does not imply that the other is 'wrong.' In the instant case, therefore, we find that the staff approach appropriate for the purposes of this proceeding. Using Mr. Rothey's computation, a rate of return of 7.05 results:

|  | "Percent of Total | Cost | Weighted Cost |
|---|---|---|---|
| "Common | 38.7 | 8.5 | .032895 |
| "Preferred | 6.5 | 7.4 | .004810 |
| "Debt | 50.5 | 6.5 | .032825 |
| "Deferred Credits | 4.3 | .0 | .000000 |
|  | 100.0 |  | .070530" |

In respect to the rate of return on the equity portion of the rate base, the Commission adopted the recommendation of 8.5 percent made by its chief economist, Mr. Rothey, even though Rothey, himself, estimated 11 percent before making the adjustment he felt was required "be-

cause the RCNLD rate base eliminates 'the eroding effect of inflation upon the value of an investment.' '' Relative to Rothey's testimony concerning the adjustment, the record contains the following:

"Q. Pardon me, Mr. Rothey, I thought having defined our terms I could ask the questions without repeating them in every question, but I will start again. The subject of this interrogation, Mr. Rothey, is the appropriate rate of return on the equity portion of the rate base of a public utility, and my understanding is your testimony is that from market evidences you reach the opinion a fair rate of return on the equity portion of the rate base of a public utility, electric utility, comparable to The Cleveland Electric Illuminating Company, except that they are in other states, is 11 percent, and that because of special considerations relating to the Ohio method of regulation you reached a conclusion that in Ohio and for the Illuminating Company this figure becomes more appropriately nine percent. Have I correctly stated your opinions as expressed in your testimony?

"A. Yes, sir.

"Q. All right, now this 11 percent and this 9 percent corresponding figure relates as a basis for their determination by you to the market price of the shares of stock in the first instance, do they not?

"A. Yes.

"Q. Then you expressed the opinion that in order to determine what is a fair rate of return for the utility to earn upon its rate base that this is the fair rate of return which should be earned upon the rate base, do you not?

"A. 11 percent.

"Q. 11 percent in one case and then with respect to the Illuminating Company 9 percent, right?

"A. Correct.

"Q. Now, as I understand it the purpose of your Exhibit 14 is to support the opinion that so far as investors generally in the market are concerned their demand of 11 percent on a market value of their shares is in respect of utilities that are earning approximately 11 percent on the

book value of the utility shares, do I correctly express the thrust of your Exhibit 14?

"A. I would like that question again."

(Previous question read.)

"A. I don't believe so. What I was attempting to do with this Exhibit 14, if I understood your question correctly, I would say no—what I was attempting to do with this Exhibit 14 was to observe what a rate of return on book value would do to the market to book ratio of the shares of the Company. I observed something around 11 percent rate of return on the book value would produce a market ratio sufficiently appropriate to allow the Company to issue new stock without diluting the ownership of the present owners.

"Q. And does that express your opinion as to the fair rate of return on the equity portion of the rate base?

"A. Yes, it does.

"Q. And you endeavored in this case to express an opinion as to a fair rate of return on the equity portion of the rate base which will produce such a market to book ratio?

"A. Yes sir.

"Q. All right, and it is your opinion then that the 9 percent return on rate base for The Cleveland Electric Illuminating Company will produce in the neighborhood of slightly above an 11 percent return on its book equity?

"A. Yes, sir."

The 8.5 percent rate of return for the equity portion of the rate base adopted by the Commission is thus based upon the opinion of its staff which, in turn, was based upon "* * * what a rate of return on book value would do to the market to book ratio of the shares of the Company."

In *Cleveland v. Pub. Util. Comm.* (1956), 164 Ohio St. 442, the court said, at page 444:

"Many of appellants' arguments represent attempts to circumvent the statutes of this state and the uniform decisions of this court with respect to the statutory rate base. For example, it is argued that the dollar amount of return should be based upon the public utility's actual 'earnings

requirements'; and that, after this is done, the rate of return should be found by determining the percentage of the statutory rate base which such dollar amount of return represents. Further, it is argued that the 5.94 per cent return on the statutory rate base approved by the commission would, if 45 per cent of its capital were replaced by debt, represent 9.26 per cent earnings on 'total capitalization' and a 9 per cent return on the 'net investment' in this public utility. However, under the Ohio statutes and the decisions of this court, the percentage return is to be related not to the 'total capitalization' or to the 'net investment' but to the statutory rate base (reconstruction cost new less depreciation) so that *neither the actual capital of or net investment in this public utility nor its actual earnings requirements are really material* in a proceeding of this kind. Any such method of determining or testing the dollar amount of return as that which is advanced by appellants would eliminate any need at all for determining the statutory rate base. The reasons advanced in support of such arguments have previously been considered and rejected as unsound by this court. See *East Ohio Gas Co.* v. *Public Utilities Commission, supra* (133 Ohio St., 212), 218, 219.''

Basing the rate of return for equity upon ''what a rate of return on book value would do to the market to book ratio of the shares of the Company'' goes beyond the ''* * * statutes and the decisions of this court'' which require the rate of return to be related to the statutory rate base. Therefore, the Commission erred in finding ''the staff approach appropriate'' in determining the 8.5 percent rate of return for the equity portion of the rate base.

### I B.
### RATE OF RETURN CALCULATION WHICH INCLUDES "ZERO COMPONENT" REPRESENTING DEFERRED CREDITS.

The Company next claims that the Commission erred in including in the rate of return calculation a ''zero component'' representing deferred credits.

In its brief, the Company states that: ''* * * As of the

date certain, the Company had on its books approximately $32 million of deferred credits representing income taxes deferred under the Internal Revenue laws relating to investment credits and amortization of pollution abatement facilities.''

As noted in the opinion and order of the Commission, ''* * * Mr. Rothey computed as a part of capital structure those amounts of funds representing the contributions in aid of construction account and the deferred credits account comprised of deferred investment credit and accumulated deferred income taxes.'' The Commission adopted Rothey's recommendation by including as part of the capital structure 4.3 percent for deferred credits upon which no return was allowed. As the Company suggests in its reply brief, the inclusion of this ''zero component'' in the capital structure is similar to the ''hypothetical company'' concept which was rejected in *General Telephone Co.* v. *Pub. Util. Comm.* (1963), 174 Ohio St. 575.

As did the creation of the ''hypothetical company,'' the ''zero component'' for deferred credits apparently ''* * * has as its ultimate purpose the reduction of the statutory rate base, which is a circumvention of the law of Ohio.'' *Ib.*, 174 Ohio St., at 579. Therefore, the Commission erred in including in the rate of return calculation a ''zero component'' representing deferred credits.

Interestingly, the Commission, itself, since issuing its opinion and order in this case, has changed its position on this question. The Commission, in case No. 72-415-Y, in *In re Application of the Cincinnati Gas & Electric Co.* (September 16, 1974), stated in its opinion and order:

''Mr. Rothey's analysis of applicant's capital structure also differed from Mr. Melnyk's approach in that Mr. Rothey included as a part of the capital structure the contributions in aid of construction account and the deferred credits account which is comprised of deferred investment tax credits and accumulated deferred income taxes. Mr. Rothey assigned these elements a zero cost of capital. Upon further consideration of the propriety of the inclusion of

deferred credits in the capital structure, the Commission finds that this treatment is inconsistent with the legislative intent to extend the advantages of the deferred investment tax credits at [sic] accumulated deferred taxes to the industry.''

## I C.
### COST OF BOND PORTION OF RATE OF RETURN.

The next contention of the Company to be considered is the claim that the Commission erred in finding the cost of the bond portion of the rate of return to be 6.5 percent. That finding resulted from the Commission's adoption of Mr. Rothey's 6.5 percent calculation. On cross-examination, Mr. Rothey admitted that long term capital could not have been raised at 6.5 percent during the test year. In response to a question whether ''it would have cost the Illuminating Company substantially more than 6½ percent * * * to have raised a substantial amount of debt capital, at or about the date certain,'' Mr. Rothey replied, ''It would have cost them somewhere around 8 percent.''

In view of the facts that the Company's witness testified that 7.35 percent was the current cost for bond money and the Commission's expert indicated that it was more than 6.5 percent, the Commission's finding of 6.5 percent is ''manifestly against the weight of the evidence'' (*Akron v. Pub. Util. Comm.* [1966], 5 Ohio St. 2d 237, 242) and, therefore, is unreasonable and unlawful.

## I D(1).
### VALUE OF RIGHT-OF-WAY USED AND USEFUL.

The Company raises two issues concerning land rights: (1) ''Right-of-way used and useful in the rendition of electric service must be included in the rate base of a utility at its value as of the date certain,'' and (2) ''land rights owned beneficially are a lawful part of a utility's rate base in a rate proceeding.''

Regarding the value of land rights, rights-of-way, including easements and licenses, the Commission's opinion and order reads, in part:

''In dealing with valuation of land rights, the Com-

mission's staff simply evaluated the varying easements and licenses held by applicant at their original cost, claiming that no acceptable method is available to adjust the value of the land rights either up or down. * * *

" * * *

"Witness Chisling [for the Company] employed the * * * method of applying trend factors to original cost because 'a parcel by parcel appraisal would be extremely costly and time consuming.' "

Chisling described the "cost trend method" as a method of "appraising the value of property by application of trend factors to the original cost, thus restating that original cost in terms of values at the date certain."

The Commission, stating that "in the absence of a verifiable method of assuring that there is a market value for applicant's rights-of-way" and "that the trending method does not comply with Section 4909.05, Revised Code," found the original cost of land rights to be the proper method of valuation.

As to the foregoing finding, the Company argues:

"In addition to the rejection of trending as unlawful, an apparent ground for refusing to find value for appellant's right-of-way * * * was that there is no 'verifiable method of assuring that there is a market value' for right-of-way easements. Since the trending method was used for less than 5 percent in value of the right-of-way and the values for the balance of the right-of-way was found by a witness and by methods specifically approved by the Commission, we must conclude that the Commission held that absent a showing that right-of-way easements are the subject of an established market they have no value for rate case purposes. This is a very disturbing holding because the statute, and the cases, permit the Company to earn only on the 'value' of the property used and useful in the public service. Original cost is in many instances used as value either because it is the best evidence thereof or because it is plainly less and by common consent is used as establish-

ing a figure not less than value where the parties for some reason do not desire to expend the time or money required for an appraisal. However, here we had an appraisal for 95 percent of the right-of-way by methods specifically approved by the Commission. We do not believe that the Commission was saying that there is no method by which to value an easement. As the evidence shows—and it is common knowledge—such valuations are daily made for a variety of reasons. If the Commission is right, that it cannot accept value in the absence of a showing that there is a market in easements, then this is a holding that in such case an easement has no value at all and there is no basis under the statute for including it in the rate base at all. We believe that we have reason to be fearful that unless this court reverses the Commission on this point, the complete elimination of right-of-way from the rate base will be the next step.''

Contrary to the Company's argument that the Commission held that right-of-way easements ''have no value for rate case purposes,'' the Commission *did* value such land rights. Thus, the only issue before this court on the question is the propriety of the Commission's refusal to accept the land right values recommended by the witness, Chisling. This is fundamentally a question of evidence. As to evidentiary matters, in appeals from the Commission, this court ''* * * will not substitute its judgment for that of the commission as to conclusions drawn * * * unless the findings and order of the commission are manifestly against the weight of the evidence or there is no evidence.'' *Akron* v. *Pub. Util. Comm., supra* (5 Ohio St. 2d 237), at 242; *Kenton* v. *Pub. Util. Comm.* (1965), 3 Ohio St. 2d 71, 73. Further a ''* * * finding and order by the commission will not be disturbed unless it appears from the record that such finding and order are manifestly against the weight of the evidence and are so clearly unsupported by the record as to show misapprehension or mistake or willful disregard of duty.'' *Cleveland* v. *Pub. Util. Comm.* (1965), 3 Ohio St. 2d 82, 84. In our opinion, the record sup-

ports the conclusions of the Commission regarding valuation of the Company's rights-of-way.

### I D(2).
### "LAND RIGHTS OWNED BENEFICIALLY" AS PART OF RATE BASE

The "land rights owned beneficially" which the Company claims should be included in its rate base is filled land upon which a part of the Company's Lakeshore Power Plant is situated. Title to that land is in the state of Ohio but the Company has used the property since 1911. The Commission, in its opinion and order, concluded that this land, not being *owned* by the Company, could not be included as part of Company property for rate base purposes.

The Company points out that this identical question was at issue in proceedings before the Commission in 1918 and in 1947. In both instances the Commission included the value of the filled land in the Company's rate base. The Commission's order of 1918 was appealed to this court, and the issue, as the Company observes, was "fully briefed and argued before this court." In that appeal, this court modified the order of the Commission but did not disturb the Commission's conclusion to include the filled land in the Company's rate base. *Cleveland* v. *Pub. Util. Comm.* (1918), 98 Ohio St. 462.

We are not inclined to now reexamine or overrule the foregoing holding. The Commission's conclusion not to include the filled land in the Company's rate base is not in conformity with that decision and therefore is unreasonble and unlawful.

### I E.
### EXCLUSION FROM RATE BASE OF CERTAIN MATERIALS AND SUPPLIES.

The next proposition advanced by the Company reads:

"Materials and supplies kept on hand and reasonably necessary for the operation of the Company's business should be included in the rate base whether or not, when used, they are expensed or capitalized."

In respect to this contention, the opinion and order of the Commission reads:

"* * * The staff opined that materials and supplies held for capital accounts are not an appropriate part of the rate base and therefore should be excluded and therefore reduced the applicant's $8,846,000 figure for materials and supplies to $1,858,000 * * *.

"* * *

"Therefore the Commission's staff * * * excluded approximately $7,000,000 from the working capital accounts in materials held for capital accounts. The staff found that 79% of applicant's materials and supplies were properly classified as being within capital accounts. * * * The applicant contends that an exclusion of capital accounts is improper. The Commission does not agree. Exclusion of materials and supplies to be capitalized is not only relevant and proper but necessary in any computation of working capital."

As to materials and supplies, the staff report states:

"The engineers have reviewed the applicant's proposal for inclusion of $8,845,651 in the total company rate base as a working capital allowance for a material and supplies inventory. The engineers are of the opinion that materials and supplies inventory held for capital accounts are not an appropriate part of the rate base and have therefore excluded that portion of those inventories. This amount was determined by the company, by analyzing issues, to be 79% of the total.

| | |
|---|---|
| "Average Material & Supplies Inventory | $8,846,000 |
| "Less Amount to Capital Construction (79%) | $6,988,000 |
| "Materials & Supplies | $1,858,000" |

In *Cincinnati* v. *Pub. Util. Comm.* (1954), 161 Ohio St. 395, 406, 407, the following discussion is found concerning materials and supplies:

"It is proper to include in the rate-base structure a

reasonable sum to cover the company's investment in materials and supplies for the normal operations of the company and for maintenance and repair purposes. But we know of no valid reason why an allowance should be made in the rate-base structure for investments in materials and supplies for new construction, extensions and additions, as distinguished from normal operations and plant maintenance and repair. The cost of materials and supplies held for new construction, extensions and additions may be capitalized in the rate-base structure, when such materials and supplies are in actual use. Prior to such actual use such property can not be considered as being 'used and useful for the service and convenience of the public,' as required by Section 499-9, General Code."

A Company witness, Mr. Loshing, was asked: "To what extent * * * does the material for this construction program come from materials and supplies account which you have assigned for working capital?"

The witness replied: "Very little goes through this materials and supplies account. * * * A good portion of the materials that are needed for what are prosaic construction, power plants, transmission subs, and high lines, is purchased directly on job orders for specific projects and delivered directly to the site."

Since the evidence indicated that "very little" of the construction funds of the Company passed through the "materials and supplies account," it was error for the Commission to reduce the amount allowed for materials and supplies by 79 percent for the reason that "79% of applicant's materials and supplies were * * * classified as being within capital accounts" under the Company's accounting system.

The Company includes in its brief an excerpt from the opinion and order of the Commission in subsequent proceedings before the Commission, *In re Application of East Ohio Gas Co.*, No. 72-378-Y, wherein the Commission retreated from the position on the allowance from materials and supplies herein and rejected "* * * staff's proposition that accounting treatment should be controlling * * *."

## I F.

### MATTERS NOT IN ISSUE UNDER APPLICATION.

The final issue presented by the Company is stated by it as follows:

"In a proceeding upon an application for an increase in rates filed by a public utility under Revised Code Section 4909.18, the Public Utilities Commission may not require the utility to assume the burden of supporting tariffs and regulations not placed in issue by the application before the commission."

To support this issue, that the Commission erroneously considered "changes in tariffs not put in issue by the application," the Company argues:

"* * * Over objection, the Commission required changes in regulations respecting time of access to customer premises, and itemization of charges for special construction and the establishment of a new regulation respecting voltage variations. * * *

"Of more consequence are the changes required * * * to eliminate from the fuel adjustment clause the reflection of fuel costs respecting the generation of the 6 percent of the energy which is lost in the process of distribution and the elimination of existing tariff discounts reflecting lower costs for certain heating usages. We are not here attempting to argue the intrinsic merit of any of these matters. We contend that the Commission may not require changes in these matters without affirmative proof, and a finding on the basis thereof that they are required."

The Company contends further that "* * * under the statutes, the Commission is empowered to require changes in existing rates and practices only after a complaint in writing about them (R. C. Section 4905.26), and an affirmative finding upon proof after hearing that existing practices are unreasonable (R. C. Section 4905.37)."

In its opinion and order, the Commission stated that its "* * * staff is mandated by Section 4909.19, Revised Code, to conduct an investigation encompassing not only the application and the exhibits attached thereto, but also, 'of all matters connected therewith.' Therefore, the Com-

mission must conclude the scope of a general rate increase certainly includes nearly all, if not all of the applicant's rules and regulations which in any manner could be applied in charging the new rates.''

It is elemental that the ''* * * commission is a creature of statute and has only those powers given to it by statute.'' *Ohio Bell Telephone Co.* v. *Pub. Util. Comm.* (1969), 17 Ohio St. 2d 45, 47. R. C. 4909.19 provides, in part:

''Upon the filing of any application for increase provided for by Section 4909.18 of the Revised Code * * * the commission shall at once cause an investigation to be made of the facts set forth in the application and the exhibits attached thereto, and of the matters connected therewith.''

We agree with the Commission's conclusion that R. C. 4909.19 permits it to review any of an applicant's ''rules and regulations which in any manner could be applied in charging the new rates,'' but the Commission's authority ends there. The scope of the Commission's inquiry does not extend to matters not put in issue by the applicant and not related to the rates which are the subject of the application.

Therefore, the Commission erred in extending its order to those matters not put in issue by the application for rate increase or not related to the rates.

Inasmuch as the Company does not ''argue the intrinsic merit of any of these matters'' in this appeal, we will not attempt to delineate which of the issues fall within the realm of the Company's application or have an effect upon the rates.

## II A.
### PROPERTY USED AND USEFUL AS PART OF RATE BASE.

In case No. 74-272, in which the city of Cleveland is the appellant, the first proposition of law reads: ''Plant located outside of Ohio is beyond the scope of the Commission's jurisdiction as defined by Section 4905.05 of the Ohio Revised Code and therefore cannot be included within the statutory rate base.''

R. C. 4905.05 provides:

"The jurisdiction, supervision, powers, and duties of the Public Utilities Commission extend to every public utility and railroad, the plant or property of which lies wholly within this state and when the property of a public utility or railroad lies partly within and partly without this state to that part of such plant or property which lies within this state, and to the persons or companies owning, leasing, or operating such public utilities and railroads, and to the records and accounts of the business thereof done within this state."

It is the City's position that R. C. 4905.05 limits the authority of the Commission to applicant's property located "wholly within this state" and that the Commission "erred by including within the rate base the applicant's interest in the Seneca production plant which is situated in Pennsylvania."

The Commission, in its opinion and order, observed that "* * * Section 4909.18, Revised Code, permits applicant to submit a valuation 'of its property used and useful in rendering the service referred to in such application'" and found that "the Seneca Plant should be included because indisputably it is used and useful in rendering the service referred to in the application."

The City contends that R. C. 4909.18 is not concerned with the jurisdiction of the Commission but with "what should be contained in a rate application by a utility." Thus, the City would confine the jurisdiction of the Commission in determining a rate base to only the property of the utility within Ohio, even though the property located outside the state is used and useful in rendering the utility's service.

R. C. Chapter 4905 is concerned with the general powers of the commission, whereas R. C. Chapter 4909 regulates the fixation of rates. R. C. 4909.04, 4909.05 and 4909.18 all mention property "used and useful" by utilities in rendering service and do not limit such property to the boundaries of the state. The test then under the statutes regulating fixation of rates is whether the property is

"used and useful" in rendering the utility's service and not the location of the property.

Considering the foregoing statutes together, we perceive no intention on the part of the General Assembly to deprive a utility of the right of inclusion in its rate base of property used and useful in rendering service where such property is located outside the state.

To so hold would deprive the utility "* * * of the right to earn a reasonable return upon the * * * value of its property used and useful in the operation of its intrastate business in this state in violation of the fundamental legal principle that a utility is entitled to earn a reasonable return upon * * * its property devoted to public service." *United Fuel Gas Co.* v. *Public Service Comm.* (1957), 143 W. Va. 33, 51, 99 S. E. 2d 1. See, also, *Lone Star Gas Co.* v. *Texas* (1938), 304 U. S. 224; *Petition of Fryeburg Water Co.* (1955), 99 N. H. 487, 491, 115 A. 2d 420.

## II B.
### ALLOCATION FOR STREET LIGHTING.

The City's next contention is that the "plant, revenues, and costs related to * * * ordinance contract sales must be removed from the rate base, revenue, and cost totals utilized by the Commission to set new rates for other classes of customer."

In support of this contention, the City refers to the fact that the Company "during the test year had over $5,000,000 in revenues from street lighting and signal systems sales made pursuant to ordinance contracts entered into between the company and the affected municipalities."

Essentially, the City's position is that the Commission should have made an allocation of property, costs and revenues connected with street lighting services provided to municipalities under municipal contracts.

On this subject, the Commission stated, in its opinion and order: "* * * [B]oth staff and applicant have adjusted for the plant devoted to street lighting by including the revenues therefrom * * *. The staff found that a sample allocation indicated no measurable effect upon the rate of return and therefore an extended allocation was

not justified for street lighting sales and sales to other pub-lic utilities * * *."

The record shows that, although the Commission made no allocation for street lighting and signal system sales, it included the revenues from those sources. The record contains the following discussion in the staff report concerning this allocation:

"This proceeding involves all types of sales except those for street lighting and to other utilities. An alloca-tion, less detailed but with sufficient accuracy to form a judgment, indicated no measurable effect on the rate of re-turn by going to an extended allocation. For this reason, and because street lighting is less than 1% of the total sales and because it is for the benefit of all customers, no formal allocation was made for this case."

Thus, it does not appear from the record that the find-ing of the Commission as to allocation for street lighting and signal system sales is "manifestly against the weight of the evidence and so clearly unsupported by the record as to show misapprehension or mistake or willful disregard of duty." *Cleveland* v. *Pub. Util. Comm., supra* (3 Ohio St. 2d 82), at 84, and *Delphos* v. *Pub. Util. Comm.* (1940); 137 Ohio St. 422, at 424.

## II C.
### ALLOCATION FOR INTERSTATE EXCHANGES.

The City's next contention is that the Commission should have separated "plant, revenues and costs" of the Company's "interstate sales and deliveries of electric energy from those allocable to its intrastate operations." This contention is directed to the Company's exchanges of electricity with utility companies in other states.

The Commission reached the same conclusion on this claimed need for allocation as it did on the asserted need for allocation of street lighting and signal system sales.

For the test year, 1971, the interchanges of electricity between the Company and others in interstate exchanges nearly balanced. The Commission's staff engineer testi-fied as to the interstate exchanges:

"* * * As you know, I am concerned with the rate base

and when I first got on the stand I explained our position as far as interchange of power and sales to other utilities was concerned. As long as these sales did not result in an amount of production facility or other facilities that were not required to service the utility's ultimate customer, then it was perfectly proper, and in our opinion—not only that, but somewhat profitable to the ultimate customers, in that if you could make sales with the somewhat underpowered production plant, and the facilities that you have that are needed for the ultimate customer, if you can make sales out of that equipment and the profits of such sales, whatever they are, or losses go to the ultimate customer, then the amount of production facilities is reasonable. But, if the amount of production facilities, for instance, is not reasonable, then you judge that sale to other utilities was a major business of the Company. But, in this case it seemed like it—while it happened that they were forced to rely on other means or other older equipment, they were still able to do it.

"So, as long as the production facilities are a reasonable amount for the ultimate customer, I don't see how we can make any correction in the rate base. And we didn't, for that reason."

As in the case of allocation of street lighting and signal system sales, the finding of the Commission is neither manifestly against the weight of the evidence nor unsupported by the record. Therefore, the City's claim that allocation was required for interstate exchanges is not persuasive.

## II D.
### FEDERAL INCOME TAX ACCRUALS.

The City's fourth proposition of law reads:

"All customer contributions in the form of accruals for the payment of federal, state, and local taxes to be paid by the applicant at future dates, which will be constant with reasonable certainty in the foreseeable future and which are available for working capital and for investment in materials and supplies, should be used to offset the allowances for working capital."

The foregoing proposition of law closely parallels

paragraph five of the syllabus in *Cincinnati* v. *Pub. Util. Comm., supra* (161 Ohio St. 395). The City argues that the "* * * Commission has manifestly incorrectly applied the law to the facts of the instant case by failing to apply any of the federal income tax accruals as an offset to the Company's working capital allowances."

The record shows that in computing working capital the Commission's staff did not take into account the federal income tax accruals of the Company. The Commission points out that "* * * staff of the Commission has developed a formula which attempts to arrive at a reasonable estimate of a company's working capital requirements" and that the "* * * formula does not attempt to take into account all tax accruals * * *." The Commission, in its brief, quotes from an opinion and order of the Commission in another rate case (*In re Application of East Ohio Gas Co., supra*) its rationale for the exclusion of federal income tax accruals:

"* * * The tax accrual offset recommended by the staff is the result of the staff's formula which has been refined over the years and which results in a reasonably accurate estimate of the benefit accruing to the appellant. The formula has the advantages of being relatively easy to understand and use, and its consistent application assures equal treatment among rate applicants. The staff's formula properly excludes federal income tax accruals because federal income taxes are now generally paid on a relatively current basis. The Commission has repeatedly and consistently accepted the staff formula as representing a reasonable estimate for the tax accrual offset."

Paragraph five of the syllabus in *Cincinnati* v. *Pub. Util. Comm., supra* (161 Ohio St. 395), reads in part: "* * * customers' contributions in the form of accruals for the payment of taxes * * * which will be constant with reasonable certainty * * * and which are available for investments in materials and supplies, or for use as working capital, should be used as an offset on the allowance for working capital * * *."

The record shows that there were some accruals for

federal income tax payments and that the evidence as to the amount was conflicting. There is nothing in the record to support a conclusion that these accruals were not available due to their payment "on a relatively current basis." Since there were some federal income tax accruals and the Commission made no allowance for them in the formula used for determining working capital requirements, it follows that the Commission failed to properly apply the holding in *Cincinnati* v. *Pub. Util. Comm.*, *supra*, in computing the allowance for working capital.

## II E.
### ALLOCATIONS BETWEEN RATE CLASSES OF CUSTOMERS.

The final contention of the City is that the Commission "* * * has a duty to fix and determine just and reasonable rates which cannot be discharged in the total absence of cost of service evidence by major rate class" and that the Commission "cannot blindly set rates when the only cost of service evidence for any of the major rate classes discloses the existence of unreasonable discrimination." It is the City's position that the evidence "showed that both the large industrial rates that were then in effect and the proposed large industrial rates produced a much lower rate of return than the overall rate or return enjoyed by the applicant upon all of its electric operation" and that therefore "the large industrial customer has been and is now being subsidized by the other ratepayers."

As the Company observes in its brief, the City here "seeks to have an allocation made of all of the Company's property and income account between all of its various classes of customers."

We will address ourselves to this issue under Part *III B* below.

## III A.
### VALIDITY OF SIERRA APPEAL.

Similar issues are raised in case No. 74-156, wherein the appellant, Sierra Club, Inc., a California nonprofit corporation interested in conservation of natural resources with members in the service area of the Company, proffers

two propositions of law, which read:

"1. Rate schedules that on their face discriminate between and among customer classes must be justified on the basis of cost of service. A failure by the utility applicant to justify such rates by reliable and probative evidence before the Public Utilities Commission requires that the proposed rates be held to be unjustly preferential and unjustly discriminatory and therefore in violation of Section 4909.15 of the Revised Code and the equal protection clause of the Fourteenth Amendment to the Constitution of the United States.

"2. When the only expert testimony presented before the Public Utilities Commission supports the proposition that proposed utility rate structures are not cost of service related, but are in fact based upon a subsidization of one customer class by another and that subsidization is not based upon valid considerations of economic and public interest justification, the Public Utilities Commission is prohibited from approving the submitted rates."

The Commission argues that this court should refuse to consider Sierra's appeal, for the reasons that the notice of appeal "fails to specify the errors in the Commission's order" and that Sierra has no standing. The Company, as intervening appellee, advances the procedural argument that Sierra, in its notice of appeal, "designates the order appealed from as the Commission's entry of January 28, 1974" when, in fact, the appeal relates to the order of the Commission made on November 28, 1973. The Company notes also that no application for rehearing was filed by Sierra to the order dated January 28, 1974.

Although the foregoing factors all present serious questions as to the validity of the Sierra appeal, the issues raised by Sierra are similar in character to those raised by the City in its final contention in case No. 74-272, and this court will, therefore, consider them.

### III B.
### RATE DIFFERENCES BETWEEN CUSTOMER CLASSES.

R. C. 4909.04 provides:

"The Public Utilities Commission, for the purpose of ascertaining the reasonableness and justice of rates and charges for the service rendered by public utilities or railroads, or for any other purpose authorized by law, may investigate and ascertain the value of the property of any public utility or railroad in this state used or useful for the service and convenience of the public. At the request of the legislative authority of any municipal corporation, the commission after hearing and determining that such a valuation is necessary may also investigate and ascertain the value of the property of any public utility used and useful for the service and convenience of the public utility where the whole or major portion of such public utility is situated in such municipal corporation."

This section was interpreted in *Toledo Edison Co.* v. *Pub. Util. Comm.* (1954), 161 Ohio St. 221, wherein the court said, at page 229:

"This section [actually R. C. 4909.04 but incorrectly reported as R. C. 4904.04], as formerly enacted [General Code 499-8], contained the word, 'shall,' where it now contains the word, 'may,' and it would seem that the valuation of the property of a public utility or railroad, in reference to rate fixing, is now, within proper bounds, discretionary with the Public Utilities Commission."

The court in that case, also stated, at page 234:

"* * * the Public Utilities Commission has discretion, in the fixing of a single freight rate, to base that rate upon matters other than the valuation of the property of the railroad and the actual cost of operation, although it has full authority to require such evidence of valuation if in its opinion such findings are necessary to a proper determination of rates. * * *"

Thus, the Commission was not required to make the cost of service allocation for classes of customers as contended by the City.

Rate differences for various classes of customers are permissible. As stated in *Buckeye Lake Chamber of Commerce* v. *Pub. Util. Comm.* (1954), 161 Ohio St. 306, 311, the "general rule is that * * * 'a utility may, without being

guilty of unlawful discrimination, classify its customers on any reasonable basis and make separate rates for each class.' * * *''

R. C. 4905.31 authorizes utilities to make classifications of services with varied charges. It reads, in part:

"Chapters 4901, 4903, 4905, 4907, 4909, 4921, 4923, and 4925 of the Revised Code do not prohibit a public utility from filing a schedule or entering into any reasonable arrangement with another public utility or with its customers, consumers, or employees providing for:

"'* * *

"'(D) A classification of service based upon the quantity used, the time when used, the purpose for which used, the duration of use, and any other reasonable consideration;

"'(E) Any other financial device that may be practicable or advantageous to the parties interested. No such arrangement, sliding scale, minimum charge, classification, variable rate, or device is lawful unless it is filed with and approved by the Public Utilities Commission.

"'* * *

"Every such arrangement, sliding scale, minimum charge, classification, variable rate, or device shall be under the supervision and regulation of the commission, and is subject to change, alteration, or modification by the commission."

Applying G. C. 614-17, the predecessor to R. C. 4905.31, the court held, in paragraph two of the syllabus, in *Cleveland & Eastern Traction Co.* v. *Pub. Util. Comm.* (1922), 106 Ohio St. 210:

"The schedules of rates and charges required to be filed by a public utility company with the Public Utilities Commission may contain a classification of its service, which classification should be based upon the quantity used, the time when used, the purpose for which used, the duration of use, and other reasonable considerations which essentially distinguish the service required to meet the various demands."

The Commission, in its opinion and order, made the

following finding as to rate structure:

"For many years this Commission has considered it proper and desirable that electric rates be so structured as to provide declining unit prices as the customers' usage increased.

"The principle may have been justifiable in periods where promotion of electric energy usage reduced the excess capacity of the electric industry which might otherwise have remained idle. Such is not the situation today where all forms of energy are in short supply and conservation of resources has become a national policy.

"The Sierra Club presented testimony of Dr. Tybout * * * which explored various types of price structuring and which concluded that a more or less flat rate structure was the most desirable. While this Commission cannot base its determination of proper rate structure upon his testimony entirely as several of his assumptions were disproved by applicant's testimony the record does support a conclusion that some modification of applicant's proposed schedule is in order.

"Applicant is therefore directed to reduce its proposals for minimum bills and initial energy blocks in the order of 20 percent and to make compensating increases in the higher usage energy blocks."

Thus, the Commission partially granted the relief sought by Sierra even though its staff made the following recommendation as to rate structure:

"1) Under 5a the petitioner urges the Commission to cause applicant to eliminate 'declining block rates'. The rate engineers recommend that the Commission reject this recommendation by petitioner on the grounds that rates of this type recognize the long established and acknowledged facts (i) that the cost of rendering service to the customer declines as the volume of such service increases; (ii) that this type of rate has been accepted as just and reasonable over many years and (iii) that rates of this type, having been tried and used over many years are now offered by a vast majority of electric utilities operating in

all parts of the United States.
"* * *

"In closing it may be said that while the rate engineers understand that it may be entirely legal and no doubt praiseworthy for the Commission to attempt to alleviate the hardships of the low income segment of our population by manipulating utility service rates they nevertheless by their recommendation to the Commission that the traditional rate pattern of price[s] receding as usage increases be retained in this proceeding."

It appearing that the order of the Commission respecting rate structure is neither "manifestly against the weight of the evidence" nor "so clearly unsupported by the record as to show misapprehension or mistake or willful disregard of duty," the contentions of the City and Sierra in regard thereto are rejected.

### IV.
### EFFECT OF ADMINISTRATIVE DETERMINATION

In respect to two issues raised herein, the Commission, in its opinions and orders in subsequent proceedings, has reversed the position taken in these proceedings. In addition, the Commission has departed from its prior determinations in respect to the Lake Shore property used by the Company. Although the Commission should be willing to change its position when the need therefor is clear and it is shown that prior decisions are in error, it should also respect its own precedents in its decisions to assure the predictability which is essential in all areas of the law, including administrative law.

Appropriate to the foregoing comments are the following statements found in *State, ex rel. Automobile Machine Co., v. Brown* (1929), 121 Ohio St. 73, 75:

"It has been held in this state that 'administrative interpretation of a given law, while not conclusive, is, if long continued, to be reckoned with most seriously and is not to be disregarded and set aside unless judicial construction makes it imperative to do so.' *Industrial Commission v. Brown*, 92 Ohio St. 309, 311, 110 N. E. 744, 745 (L. R. A.,

1916B, 1277). See, also, 36 Cyc., 1140, and 25 Ruling Case Law, 1043, and cases cited.

"This is a well-recognized principle of statutory construction, and we deem it applicable in the present instance. * * *"

## V.
## CONCLUSION.

In case No. 74-276 and in case No. 74-272, the order of the Commission, being unreasonable and unlawful, is reversed, in part, and the causes are remanded to the Commission for further proceedings in accordance with this opinion. In case No. 74-156, the order of the Commission is affirmed.

In case Nos. 74-276 and 74-272,
*order affirmed in part and reversed in part.*
In case No. 74-156, *order affirmed.*

O'NEILL, C. J., STERN, CELEBREZZE, W. BROWN and P. BROWN, JJ., concur.

HERBERT, J., concurs except for the eighth paragraph of the syllabus.