GENERAL MOTORS CORPORATION, APPELLANT, *v.* PUBLIC
UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as General Motors Corp. v. Pub. Util. Comm.
(1976), 47 Ohio St. 2d 58.]

(No. 75-1152—Decided July 14, 1976.)

60

*Messrs. Bell & Clevenger, Mr. Langdon D. Bell, Messrs. Shannon & Morley, Mr. Louis Flax, Mr. Frazer F. Hilder* and *Mr. William A. Vaughan,* for appellant.

*Mr. William J. Brown,* attorney general, *Mr. Charles S. Rawlings* and *Ms. Cheryl Hachman,* for appellee Public Utilities Commission.

*Mr. William J. Moran, Mr. James J. Mayer, Messrs. Squire, Sanders & Dempsey* and *Mr. Alan P. Buchmann,* for appellee Cincinnati Gas & Electric Co.

CORRIGAN, J. The appellant propounds three propositions of law for this court's consideration. They state, in substance:

(1) The Public Utilities Commission failed, in its opinion and order of September 16, 1974, to make essential

findings of fact supported by the record or reasons derived from the record and stated only ultimate conclusions of law;

(2) The findings of the Public Utilities Commission are manifestly against the weight of the evidence and are clearly unsupported by it so as to show misapprehension, mistake or willful disregard of duty;

(3) The reference by the Public Utilities Commission to this court's affirmance, in *Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403, of a commission opinion and order wherein similar rate design changes were imposed does not justify the imposition of identical changes unless there is evidence of comparability of the companies and the areas served, but in any case an affirmance on the adequacy of the evidence in that case is irrelevant to the issue of the rate design in the present case.

In regard to appellant's proposition of law No. 3, we do not understand the commission's opinion and order of September 16, 1974, or the opinion and order on rehearing of October 17, 1975, to be based upon any evidence other than that embodied in the record in the present case. Appellant's contentions in this proposition of law will be discussed only in regard to the adequacy of the evidence in this case.

Appellant's propositions of law No. 1 and No. 2 are, in essence, that the opinion and order of the commission fails to state specific findings of fact supported by the record, the reasons upon which the conclusions in the commission's opinion and order were based, as required by R. C. 4903.09, and is manifestly against the weight of the evidence and unsupported by it so as to show misapprehension, mistake or willful disregard of duty.

*I.*

We turn first to the contention that the commission's opinion and order fails to state specific findings of fact supported by the record and the reasons upon which the commission's conclusions in its opinion and order were based.

64

R. C. 4903.09 provides:

"In all contested cases heard by the Public Utilities Commission, a complete record of all of the proceedings shall be made, including a transcript of all testimony and of all exhibits, and the commission shall file, with the records of such cases, findings of fact and written opinions setting forth the reasons prompting the decisions arrived at, based upon said findings of fact."

In its opinion and order of September 16, 1974, the commission states its finding that the applicant, CG&E, reduce its proposals for initial energy blocks, in the order of 20 percent and make compensatory increases in the higher usage energy blocks. The opinion and order states that this determination is based upon the staff recommendation. A later paragraph refers to staff recommendations made at the hearing. An examination of the testimony of the staff witness, Mr. Paul E. Hampton, taken at the hearing and later testimony at the rehearing, clearly supports the position of the commission. This testimony is extensive and establishes the reasons for the commision's decision that an increase in the rates of the higher energy usage blocks and a decrease in the lower energy usage blocks would promote the conservation of energy and continue to be a just and reasonable rate structure. This testimony, we feel, has been incorporated into the opinion and order of the commission by reference to the staff recommendation. *Braddock Motor Freight* v. *Pub. Util. Comm.* (1963), 174 Ohio St. 203; *Buckeye Lake Chamber of Commerce* v. *Pub. Util. Comm.* (1954), 161 Ohio St. 306.

Likewise, the stated reason for the determination as to the required rate structure, that the declining block structure promotes the usage of electrical energy which might have remained idle and which should now be conserved through revision of the rate structure, explains in sufficient detail the reason for the commission's decision to enable this court to determine how the decision was made, particularly in reference to the testimony of the only staff witness at the hearing, Mr. Hampton. *General Telephone Co.* v. *Pub. Util. Comm.* (1972), 30 Ohio St. 2d 271.

It should be noted that R. C. 4909.15, in empowering the Public Utilities Commission to fix rates, provides that the commission "* * * shall, with due regard among other things, to the value of all property of the public utility actually used and useful for the convenience of the public * * * and with due regard to all such other matters as are proper, according to the facts in each case, fix and determine the just and reasonable rate * * * for the performance or rendition of the service, and order such just and reasonable rate * * * to be substituted for the existing one." Clearly, the commission has considerable discretion in setting rate structures, and, when the commission approves schedules representing its own judgment based on evidence before it and an exercise of its sound discretion, the commission has exercised proper judgment pursuant to R. C. 4909.15. *Industrial Protestants* v. *Pub. Util. Comm.* (1956), 165 Ohio St. 543.

The mandatory duties and, therefore, findings which the commission is required to make in a hearing on an application to increase utility rates were stated in *Cleveland* v. *Pub. Util. Comm.* (1956), 164 Ohio St. 442. They are:

(1) Determine the dollar amount as of a date certain of the reconstruction cost new less existing depreciation of the property of the utility used and useful in rendering the service for which the rates are sought, *i. e.,* the rate base;

(2) Determine what percentage will represent a fair annual rate of return;

(3) Determine the dollar annual return to which the utility is entitled by applying the rate of return percentage against the dollar amount of the statutory rate base;

(4) Determine the annual expenses;

(5) Add the dollar amount of return to annual expenses (the result is the allowable gross annual revenues);

(6) *Fix rates which would have provided the public utility with an amount equal to such allowable gross annual revenues.*

Clearly, the commission has complied with these duties in the present case and has made adequate findings. The actual fixing of rates requires primarily an exercise of

judgment and discretion by the commission. Many factors enter into this discretion, including the primary goal of recovering the allowable gross annual revenues from customers through the rate schedules. Certainly, a just and reasonable allocation of rates among classes of customers and an attempt to fairly relate the cost of the service to each class of customers to the rate for that class are important considerations in structuring rate schedules. This court, however, has rejected the contention that cost of service allocations for classes of customers are required under R. C. Chapters 4905 or 4909. It follows that the failure to make specific findings on such a standard cannot be a basis for reversal of the commission's order.

For the foregoing reasons we reject appellant's contention that the opinion and order fails to state specific findings of fact supported by the record and the reasons upon which the commission's conclusions were based.

## II.

Appellant maintains in its second proposition of law that the rate structure approved by the commission disproportionately increases the cost of electricity to large users in relation to the cost to smaller users. Appellant argues that the averred purpose of the commission in establishing such rate structure, that is, the conservation of energy resources, is unsupported by evidence in the record and is manifestly against the weight of the evidence.

This court will not substitute its judgment for that of the commission on questions of fact unless it appears from the record that the findings and order were manifestly against the weight of the evidence, or are so clearly unsupported by it as to show misapprehension, mistake or willful disregard of duty. *Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm., supra* (42 Ohio St. 2d 403).

An excerpt from the record on rehearing contains the following testimony of the commission's rate expert, Mr. Paul E. Hampton:

"Q. Mr. Hampton, would you please describe briefly the nature of your previous testimony?

"A. Yes. In considering what additional testimony I

might offer in this proceeding, I have reviewed the portion of the transcript in which was recorded my original testimony on both direct and cross-examination. I find, on page 482 of the transcript, that in response to a question by Mr. Henley, I answered as follows:

" 'Well, in the intervening period, the course of events has led to greater emphasis on the conservation of all forms of energy, including electric energy, and we have come to feel more and more that rate structures that encourage the large user to use more may be defeating the purpose of the various agencies, of government, and I guess we can say the populace in general, to conserve energy.

" 'It would appear then that perhaps rate structures should be amended and allowed possibly to depart somewhat from the traditional thought of tying them directly to costs to discourage the heavy use.'

"It is my opinion that in those two paragraphs can be found the key to the position that I have taken in this proceeding, and others, with regard to rate structure. Granted that the semantics may not have been as polished and precise as they might have been, I believe the essence of the position is clear.

"As Mr. Dickey, a company employee has pointed out in the recent testimony, the commission's staff had not foreseen when the secretary's report was written how the energy situation was going to develop and had, in accordance with its best judgment at that time, stated that the structure of the rates proposed by the applicant appeared satisfactory. It was our testimony at the hearing that the situation had and was changing radically and that the need to conserve energy was rapidly becoming more and more apparent. This change in circumstances led us to believe a change in the rate structure was indicated.

"Q. Mr. Hampton, does your opinion that rate structures should take into account the need to conserve energy hinge upon a determination that a particular company lacks generating capacity?

"A. No. In our opinion, the conservation of energy today serves a two-fold purpose in the electric utility field

or perhaps three-fold. First, of course, is just the basic fact of conserving our supply of fossil fuel; oil, gas or coal (in this case mostly coal) which we have suddenly come to realize is not unlimited. The second is to avoid insofar as possible, bidding up the price of the basic energy, the power plant fuel, thus playing havoc with the pocketbooks of the customers, large as well as small. The third, and one whose importance has increased recently is to limit, or reduce contamination of our land, water, and air by reducing the amount of electric energy produced so reducing the amount of fuel burned to produce the energy and so reducing stack emissions from power plants.

"Q. Could you explain how this policy to promote the conservation of energy can be implemented through the design of a rate structure?

"A. Yes; a basic law of economics with respect to the supply of and demand for a product is that an increase in price will result in a decrease in demand. In rates such as those herein considered (GSL for example) all customers go through the first block, most go through the second and third, and a diminishing number go through the ensuing ones until relatively few get into the final, or tail, block. But, these latter few do use and pay for relatively large quantities of energy. Since it is these customers who run into or through the last or next to last rate blocks who use the greatest quantities of energy, it is they who have the greatest opportunity for savings (conservation) and from this it seems logical that in addition to their altruistic motives for conservation it is they to whom a financial or economic motive for reducing load should be offered. And, should they refuse to accept the offer as at least one witness in this proceeding has suggested they will, then perhaps, the price might be increased until they do.

"Q. With respect to the tariff originally filed by the applicant have you determined what increase was proposed in the initial and tail blocks of the GSL rate?

"A. I find the company's original proposal was to increase the rate for the first energy block by 11.8 mills per Kwh and the tail or end block by 3.5 mills per Kwh. I made

no effort to convert these figures into percentages since in my opinion percentages of increase are irrelevant; it is the amount of the increase that is of interest to the customers.

"Q. In your opinion can increases in rates and the impact of changes in the rate structure be adequately analyzed on the basis of computing and comparing percentages?

"A. Definitely not. Rates and rate structures are not in our opinion susceptible to design or comparison on the basis of percentages. In preparing the secretary's report the staff is of course unaware of what the commission's decision will be as to the amount of revenue or increased revenue to which the applicant may be entitled. Thus it is impossible to go into any criteria in that report or in testimony presented at a hearing as to the amount or percentage, if you will, of any proposed changes in rates or rate structures. In this case the commission saw fit to require that the proposed first block unit price be lowered by 20% because they had to select a figure as a starting point that they believed to be fair and reasonable, not because that percentage was believed to be right and any variation from that percentage would be wrong. If, as I had suggested in my testimony was desirable, prices in the large usage blocks were to be increased to induce conservation, then corresponding reduction should be made elsewhere. The conclusion was reached that it should be in the initial rate blocks.

"Q. Could you describe how the rate structure which was approved in the commission's order differs from that initially proposed by the applicant?

"A. In comparing the applicant's originally proposed GSL rate and the rate which it proposed in compliance with the commission's September order, we see the following:

"1) No change was made in the proposed demand charges.

"2) A reduction was proposed in the initial block of 500 Kwh from 6.30c per Kwh to 5.73c per Kwh.

"This, as is readily seen would have a 'flattening' effect on the rate and would result in a reduction in applicant's revenues.

"3) As authorized by the commission in its September order, the rates for the second through the seventh block were increased in amounts ranging from 0.08c for the second block to 0.35c for the seventh contra to the change in the initial block, the amounts of these changes were designed to restore the level of revenues deserved from these customers.

"Q. Isn't it true that pursuant to the rate structure authorized by the commission the rate paid per Kwh by the customer who purchases energy in larger amounts are substantially less than those paid by customers who purchase small amounts?

"A. Yes. For example the rates per Kwh in the tariff approved by the commission in the initial energy block of the GSL rate is 5.73c per Kwh while the rate per Kwh for the final or tail blocks are 1.32c per Kwh.

"Q. Why is there such a differential in price to these consumers?

"A. It is an inherent characteristic of a declining block rate structure that as usage goes up price goes down. But, the rate of decline comes primarily from the following two sources:

"1) In the past rates have been often raised by applying a uniform percentage to each of the existing block rates. Thus the rate in the blocks where it was already the highest went up more than the rate did in those blocks when the rate being superseded was lower. This had a tendency, as we believe is readily seen to constantly increase the price differential between blocks.

"2) Secondly, past practice in rate design has been directed to encouraging use. This has resulted in what we may call for lack of a better term 'padding' of the low use block rates so that these high use rates could be held down.

"Q. Mr. Hampton, is it your opinion that the design of a rate structure should be based solely on consideration of whether that structure is based on how costs are incurred by a company?

"A. No, it is not. A company's costs are a vital element in determining its overall revenue requirements in the

regulatory processs but in the highly complex electric systems of today, we are of the opinion that to 'break down' cost by customers, groups of customers, classes of customers, etc., is impractical if not impossible. It is quite generally recognized that there are cost differences that arise from sales volume, load factor, peak responsibility, transmission distance, delivery voltage, and other causes, but in our opinion no more than an estimate can be made of what these differences are. This is evidenced by the great difference in rate structures as proposed to this commission by Ohio companies without even going into those proposed and used in other states. For almost the entire history of the electric utility industry, 'load growth' has been the ultimate goal and rates that would encourage and achieve it were considered as basic needs. Other considerations have been the filling of 'valleys' in load pattern, attracting industry and population and similar things. Today with the developing and developed energy shortage (prime energy) we believe a rate approach that would encourage its conservation is much more desirable than one that encourages its use.

"In effect, while we have recommended maintaining the basic premise of a declining block structure, the commission has ordered that it be flattened somewhat in order to achieve what, in our opinion, is as real a concern as that of how costs are reflected in a rate structure—that is: how can a rate structure be designed in order to encourage consumers to conserve in their use of electricity? .
"**  *  *

"Q. Mr. Hampton, to your knowledge, have rate structures, in general been designed on the basis of statistical studies which relate costs to classes of customers?

"A. No. In fact it has been almost universally the custom for rate structures to be designed through the exercise of judgment. Although complex studies based on statistical analysis of customer use, company costs, etc., are presently being compiled throughout the country, we know of no rate structures which are based solely on such studies. In the absence of such data and analysis, rate structure en-

gineers more generally perform their function largely by attempting to design a rate which accomplishes certain general goals. Of course statistical studies on demand, etc., are valuable, but they are a refinement on the process. A relatively modern one. Furthermore, they have never been considered by this commission as a prerequisite for the approval of any particular rate structure or any type of rate structure.

"Q. In your opinion does the commission's decision that the rate structure proposed by the applicant be modified in the way in which it would require a cost of service study before it could reasonably be instituted?

"A. No. Not unless we assume that all rates must be based on complex cost of service studies. An assumption which I believe cannot and should not be made. I would like to point out however, that there are many kinds of studies which can be used in designing or reviewing rate structures. Studies are not always, nor even in a majority of instances, exercises in arithmetic or even higher mathematics. In my opinion, any review and consideration of a specific problem or situation that leads to or assists in the making of a decision is a 'study.' In deciding that conservation could be advanced by the device of ordering the raising of rates to large users and, to avoid the development of windfall profits to the company, ordering a lowering of the rate for the initial block it would be helpful to have available all kinds of 'studies.' However, the degree and amount of 'studies' which are relied upon, particularly in the area of rate design should depend heavily on the circumstances. In the final analysis, the question is whether the decision was fair and reasonable; not whether or how many statistics were compiled. If after careful and thorough consideration by the commission it appeared to the members that conservation could best be advanced by the device of modifying the rate structure no further 'study' need be made.

"* * *

"Q. In your testimony (page 508) you stated that the GSL rate could be flattened out not that it should be, and

that a number of consequences should be weighed in making a decision to flatten the block structure. In your opinion, is it reasonable to adjust the rates in the manner set forth in the commission's opinion and order in this case?

"Yes. In my opinion, the shortage in prime energy available for burning in power plants is going to get worse, not better, and we should be doing whatever we can about it, not just sitting and hoping it will go away if we ignore it. I heartily concur with the approach decided upon by the commission to attempt to encourage conservation by the large users (who have the most opportunity for the most conservation) by offering to them a financial reward for their cooperation. At the moment this surely appears to be a most reasonable approach.

"Q. In your opinion would the rate design authorized by the commission achieve the objective of promoting conservation of energy?

"A. Hopefully yes. Although with no historical guide posts we do not believe it is possible to quantify the probable results. Human nature being what it is, it is difficult if not impossible to predict in advance of a price change with regard to a service or commodity, what the effect on demand will be except that an upward price adjustment will usually reduce demand and vice versa.

"* * *

"Q. Should the sales for the test year which were used as a base for computing revenues to which company have been adjusted in order to reflect the possible consequences of a change in rate structure?

"A. We believe it to be a requirement by Ohio statutes or court decisions that sales in the test year, adjusted only for known changes, should be used in estimating the annual revenue to be derived from the application of any new rates. If sales in ensuing years do not comport with those in the test year, the company's revenues will be higher or lower as the case may be. Until someone can develop a 'sure-fire' way to predicting the future, we know of no way by which an adjustment which takes account of possible future developments can be developed. And, we might add, the

rate structure can hardly be expected to compensate for this phenomenon whether it be changed or let alone.

"Q. Mr. Hampton, in your opinion does the commission's modification of the rate structure filed by the applicant in this case result in a fair and reasonable rate structure?

"A. I believe that the results will be fair and reasonable or at least as much so as any that could be predicted based on *any* rate. It has been said and resaid in the course of this proceeding that rate design or rates not based on cost exclusively are *per se not* fair and reasonable. This I dispute. Electric rates never have been in any general sense based on true and accurately determined costs. In fact there has never been to my knowledge any consensus amongst any large group as to how and by what means such costs can be determined. Always, it seems, rates have been used to promote various concepts such as: (1) the sale of various appliances; (2) increased power and energy sales; (3) filling valleys in the daily and seasonal load curves; and (4) to create new fields for sales opportunities. All of these endeavors have been sponsored mainly by the utilities and have been actually of a load building nature, however, regulatory commissions have lent power and approval to the activities of the utility proposals. In no case that we know about has it been claimed that rates designed for such purposes were not fair and reasonable and we cannot accept the concept that rates designed to retard, not encourage, load growth are any less fair and reasonable.

"Q. Do you have any other comments that you believe are pertinent in this proceeding?

"A. Yes, I do. I would like to say that no one that I know of, not myself I am sure, and I believe that I can say the same for the commission, believes that the rates ordered and accepted in this case represent Utopia. They do, I believe, represent a sincere effort to act reasonably and fairly in the best interests of all of the customers of Cincinnati Gas & Electric and of all the people of Ohio. The situation will no doubt be watched closely and if it does not turn out as anticipated, we assume further refinements will be made."

This testimony was supported in the record by the testimony of Mr. Lamar Dickey, a witness for CG&E. While this testimony is contradicted in part by that of the appellant's witnesses, it was not disproved in the record. It is worthy of note that the order of the commission does not eliminate declining block rates but modified the rate schedule, resulting in a flattening effect upon the rate differentials between the blocks in CG&E's general service energy schedule.

The fact that these modifications do not unreasonably increase energy charges to large users is well-illustrated in the case of the appellant herein. The net effect on the appellant for a 12-month period was a $384.61 increase out of a total of $39,940.46.

This testimony also points out the fact that cost-relatedness, although one of many factors to be considered in rate making, is not the sole criteria for allocating allowable gross revenue requirements among various classes of utility users. Clearly, the record and this court's examination of outside sources establish the fact that it is impossible to allocate the fixed costs of a utility to particular customers. Any such attempt to recover costs from customers must utimately require judgment based upon a determination of what is a just and reasonable rate.

Appellant's contention that certain types of evidence are required to support a modification of rate structures is rejected by this court. *Globe Metallurgical* v. *Pub. Util. Comm.* (1974), 40 Ohio St. 2d 40.

It appearing that the order of the commission respecting rate structure is neither "manifestly against the weight of the evidence" nor "so clearly unsupported by the record as to show misapprehension or mistake or willful disregard of duty," the order of the Public Utilities Commission is affirmed. *Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm., supra* (42 Ohio St. 2d 403).

*Order affirmed.*

O'NEILL, C. J., HERBERT, STERN, CELEBREZZE, W. BROWN and P. BROWN, JJ., concur.