168

City of Cincinnati, Appellant, *v.* Public Utilities Commission of Ohio et al., Appellees. (Two cases.)

[Cite as Cincinnati v. Pub. Util. Comm. (1978), 55 Ohio St. 2d 168.]

(Nos. 76-1230 and 76-1326—Decided July 19, 1978.)

*Mr. Thomas A. Luebbers,* city solicitor, *Mr. W. Peter Heile, Messrs. Goldberg, Fieldman & Hjelmfelt* and *Mr. Reuben Goldberg,* for appellant.

*Mr. William J. Brown,* attorney general, *Mr. Charles S. Rawlings, Ms. Cheryl K. Hachman, Mr. Marvin I. Resnik, Mr. Kevin F. Duffy* and *Mr. Mark C. Sholander,* for appellee.

*Messrs, Squire, Sanders & Dempsey, Mr. Alan P. Buchmann, Mr. William C. Donahue, Mr. William J. Moran* and *Mr. James J. Mayer,* for intervening appellee Cincinnati Gas & Electric Co..

*Per Curiam.* Appellant raises numerous propositions of law in its appeals. Two of those are constitutional challenges. The remaining propositions raised by appellant primarily challenge the reasonableness and lawfulness of the rates established by the commission and the calculation of expenses used by the commission when it determined those rates.

### I.

In its first proposition of law the city contends that the severance of its case from the rate cases concerning the rest of the area serviced by the gas company denied the city due process of law and a fair hearing in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution, because the decisions as to uniform rates and earnings erosion adjustments made in the municipality and unincorporated area cases precluded any different decisions in the city's rate increase case.[1]

As a general rule, an administrative agency's decision to consolidate or not consolidate two or more proceedings is a matter of administrative discretion and does not affect the party's rights to due process. See 1 Ohio Jurisprudence 2d 366, Actions, Section 82; Davis, Administrative Law, Section 8.10; *Transcon Builders, Inc.,* v. *Lorain* (1976), 49 Ohio App. 2d 145. However, a party's due process rights may be violated by the decision to sever two cases if the effect of holding a hearing for one party only is to make the second party's hearing an empty thing. *Ashbacker Radio Corp.* v. *F. C. C.* (1945), 326 U. S. 327, 330.

We do not find, however, that the *Ashbacker* doctrine applies to the instant cause. Under the facts of the *Ashbacker* case, the grant of one station's radio broadcasting

---

[1]The city also contends that it was denied due process and a fair hearing because the commission's staff and the other areas serviced by the company effectively settled their rate disputes before it was afforded the opportunity to participate in those negotiations. We find this argument to be without merit. It is undisputed that the city was informed of the negotiations. Appellant's second proposition of law is, therefore, overruled.

application meant the *automatic denial* of the second station's license request. The two applications were mutually exclusive. In the instant cause, the commission's grant of one rate outside the city did not preclude the possibility of a different rate inside the city.

The commission's *order* offsetting the company's loss of sales to interruptible industrial customers by adopting a nine cent per thousand cubic foot earnings erosion adjustment in the municipalities and unincorporated areas only authorized the company to recover an *allocated share* of that total loss of revenue. Therefore, while it might have been economically questionable for the commission to determine that something considerably less than a nine cent rate was reasonable for the city, the city was not *automatically denied* a lower earnings erosion rate by the order in the earlier case.[2] Similarly, the adoption of uniform rates outside the city did not mandate the adoption of such a rate inside the city because there is no requirement that rates of return be uniform throughout a utility's entire service area if those rates of return are reasonable. *General Telephone Co.* v. *Pub. Util. Comm.* (1976), 46 Ohio St. 2d 281. We therefore find that the severance of the city's case from the cases concerning the company's noncity customers did not deny the city due process of law and a fair hearing in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution. The city's first proposition of law is, therefore, overruled.

## II.

In addition to its constitutional arguments, the city also takes exception to the rate increases ordered by, and the methods for determining those increases applied by, the commission in its finding and September order on the company's application to increase rates within the city. The methods for determining those rates which the city

---

[2] Given the evidence that the city benefited from the increased gas resources made available by the utility's sales losses, it was highly unlikely that the commission would have found a rate *significantly* lower than nine cents per thousand cubic feet to be reasonable and lawful.

questions have to do with the commission's inclusion of certain expenses in its rate-making formula. The challenged expenses include the company's charitable contributions and (as they were computed by the commission) the company's federal income tax and test-year operating expenses. The increases challenged by the city include (1) the nine cent per thousand cubic foot earnings erosion charge; (2) the commission's prescription of uniform rates; and (3) the allowance of a 7.74 percent overall rate of return.

The first issue we address is the city's contention that the commission's inclusion of charitable contributions in its calculation of operating expenses was unreasonable and unlawful.

The value of charitable contributions by public utilities has been recognzied in other jurisdictions. *Re New York Telephone* (N. Y. Pub. Serv. Comm., July 1, 1970), 84 PUR 3d 321, at page 349. The federal Power Commission has allowed such contributions to be included in the cost of service, stating, in *Re United Gas Pipe Line Co.* (1964), 31 FPC 1180, 1189, 54 PUR 3d 285, 295:

"* * * We believe that contributions of a reasonable amount to recognized and appropriate charitable institutions constitute a proper operating expense. Corporations have an obligation to the communities in which they are located and they are expected to recognize this obligation. It is our opinion that these contributions have an important relationship to the necessary costs of doing business."

Moreover, given the vigorous fund-raising efforts of charities, contributions made by utilities are frequently less than voluntary (1 Priest, Principles of Public Utility Regulation [1969], 87). In addition, most charities depend upon corporate contributions, including contributions by utilities, for their existence. (*Re New York Telephone, supra*, at page 350.) The realities of charity fund raising and the benefit to society provided by charitable organizations would appear to justify including the cost of a utility's charitable contributions in its operating expenses.

Moreover, the cost of a utility's charitable contributions borne by an individual consumer should be minimal if the utility's total contributions are reasonable, and the contributions themselves might directly benefit the consumer if the organizations supported by the utility provide services in the communities in which the consumers reside. We therefore find that the commission operates reasonably and lawfully when it includes a utility's reasonable charitable contributions[3] which benefit the communities in which they are made in its calculation of the utility's operating expenses. The city's fifth proposition of law is therefore rejected.

The remaining operating expense calculations challenged by the city as unreasonable and unlawful are those resulting in the commission's figures for federal income tax and test-year expenses.

This court's standard of review for a determination by the Public Utilities Commission is set forth in R. C. 4903.13.

R. C. 4903.13 provides:

"A final order made by the public utilities commission shall be reversed, vacated, or modified by the supreme court on appeal, if, upon consideration of the record, such court is of the opinion that such order was unlawful or unreasonable."

Under the "unlawful" or "unreasonable" standard of R. C. 4903.13, this court will not reverse or modify a

---

[3]This position was given implicit support in our recent decision in *Franklin Co. Welfare Rights Org.* v. *Pub. Util. Comm.* (1978), 55 Ohio St. 2d 1, which upheld the commission's allocation of charitable contributions. It has also been expounded in a number of commission cases including *Re Ohio Bell Telephone Co.* (1976), 74-761-TP-AIR, 15 PUR 4th 344. The contributions which the commission has approved in the *Ohio Bell* opinion and in the past have not exceeded 0.10 percent of gross test-year operating revenues. The charitable contributions at issue in the instant cause amount to about a 0.11 percent of the gross test-year operating revenues. We do not find this amount of deviation from 0.10 percent sufficient to render the commission's inclusion of charitable contributions as operating expenses to the instant cause unreasonable or unlawful.

determination unless that determination is manifestly against the weight of the evidence and so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty. *Delphos* v. *Pub. Util. Comm.* (1940), 137 Ohio St. 422, 424; *Cleveland Electric Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403, paragraph eight of the syllabus; and *General Motors Corp.* v. *Pub. Util. Comm.* (1976), 47 Ohio St. 2d 58, paragraph two of the syllabus.

The commission's federal income tax and test-year expense calculations are not manifestly against the weight of the evidence.

In its fourth proposition of law, the city challenges as unreasonable and unlawful "the establishment of rates based on an allowance for federal income taxes in excess of the company's actual tax liability." To begin with, the record reveals that any discrepancies which may exist between the company's effective tax rate and the rate applied by the staff were not due to consolidation. Therefore, the city's reliance on *Federal Power Commission* v. *United Gas Pipe Line Co.* (1967), 386 U. S. 237, is misplaced. Moreover, the record does not clearly indicate that the staff applied a 48 percent corporate tax rate when it calculated the company's federal income tax liability for rate-making purposes. (The witness who mentioned a 48 percent tax rate merely stated that the 48 percent tax rate used to calculate the federal income tax would be on revenues accrued after the company received rate relief. In addition, since the company in the instant cause is a flow-through company for accounting purposes and the staff accountants started with the tax expense recorded in the utility's books, it is likely that the difference in the effective tax rate and the 48 percent rate was reflected in the staff's figures.) In light of the above evidence, we cannot say that the commission's calculation of federal income taxes is manifestly against the weight of the evidence and so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty. *General Motors Corp., supra.* The city's fourth proposition of law is, therefore, overruled.

The last calculation challenged by the city is the test-year expense figure used by the commission. Since the record reveals that the test-year expenses recommended by the staff did not include an adjustment for post-year wage increases,[4] we find this argument to be without merit, and we find it unnecessary to address the issue of whether such wage increases may be considered in test-year expenses. The city's sixth proposition of law is thereby overruled.

### III.

The city also challenges three rate increases ordered by the commission. The first rate increase which the city takes exception to is the commission's application of a nine cent per thousand cubic foot earnings erosion charge. While it is true that the commission applied a uniform earnings erosion charge to the city and noncity areas serviced by the company even though the greatest proportion of the eroded earnings occurred outside the city, the application of that rate in the instant cause is not unreasonable or unlawful. The commission found that establishing a uniform earnings erosion rate was justified because the gas made available by the interrupted service causing the earnings erosion "is of benefit to *all* its firm customers, without regard to the chances of municipal boundaries." In light of the testimony at the rate increase hearing that the gas not delivered to interruptible customers becomes available to the entire system, including the city of Cincinnati, we cannot say that the commission's determination was manifestly against the weight of the evidence or that its establishment of a nine cent earnings erosion charge was unreasonable or unlawful. The city's first challenge to the rates imposed upon it is therefore overruled.

The second rate challenged by the city is the uniform

---

[4] In the Staff Report of Investigation in the case involving customers in Cincinnati, the staff incorporated by reference all accounting recommendations contained in the Staff Report in the case involving customers in unincorporated areas. The latter Staff Report recommended that no adjustments should be made for the test-year cost increases.

rate imposed on it by the commission. The city argues that the commission's application of a uniform rate should not be sustained because the record reveals no substantial evidence supporting the establishment of uniform rates. At the hearing, the company presented testimony that traditional wisdom concerning the cost of providing gas to city and noncity residents no longer applies and that, instead, the cost of noncity service has so decreased and the cost of city service has so increased that a uniform rate is justifiable. In support of that position, the utility's witness cited the increasing density of noncity populations which lowers noncity service cost, the age of the city's plant, the location of its pipelines and the numbers of the city's uncollectible accounts which raise its service costs and the ever-increasing percentage of cost which is attributable to expenses like gas purchases which remain the same regardless of whether the customer is a city or a noncity resident. In light of that testimony, we cannot agree with appellant that the commission's prescription of a uniform rate is manifestly against the weight of the evidence. The city's second challenge to the commission's rate determinations is without merit.

The city's third challenge to the rates imposed on it by the commission is that "the overall rate of return of 7.74 percent was also unlawful." We disagree. Of the two expert witnesses testifying before the commission, one suggested as fair and reasonable a rate of return of 8.8 percent to 10.2 percent. The commission's staff witness suggested a wider range, including the 7.74 percent finally adopted. In the absence of evidence refuting this testimony, we do not find that overall rate of return to be unlawful or unreasonable. The city contends further that despite the expert testimony supporting a 7.74 percent rate of return as reasonable, the rate of return adopted by the commission was *per se* unreasonable because the commission relied on an excessive estimate of the company's rate of return on common equity to arrive at the 7.74 percent figure. Even if we assume, *arguendo,* that the 12 to 13 percent rate of return on com-

mon equity figure adopted by the commission is excessive *per se*, we cannot find that the 7.74 percent rate of return was excessive in the absence of evidence showing a direct correlation between the rate of common equity and the rate of return. We therefore find that the commission's adoption of a 7.74 percent rate of return was reasonable and lawful. The city's final challenge to the rates imposed on it by the commission is, therefore, without merit.

The orders of the Public Utilities Commission being neither unreasonable nor unlawful are accordingly affirmed.

*Orders affirmed.*

O'NEILL, C. J., HERBERT, W. BROWN, P. BROWN and SWEENEY, JJ., concur.

CELEBREZZE, J., concurs in the judgment.

LOCHER, J., dissents.

LOCHER, J., dissenting. I must respectfully dissent.

The majority opinion inexorably leads to the ratepayers shouldering the expense of a public utility's (a monopoly guaranteed by the state) charitable contributions.

Citing three cases that permit the expense of charitable contributions of a utility to be charged to the ratepayers and referring to a comment in Priest, Principles of Utility Regulation (1969), at page 87, that contributions by utilities are frequently less than voluntary, the opinon rather nonchalantly accepts a passing of these costs on to the ratepayers as if no other result were conceivable.

In my prior dissent in *Franklin Co. Welfare Rights Org.* v. *Pub. Util. Comm.* (1978), 55 Ohio St. 2d 1, I quoted at length from an opinion of the Supreme Court of Alabama,[5] wherein that august body, with good justification, declined the opportunity to burden the utility ratepayers with the charitable contributions of the public utility. The issue of whether the ratepayer should be required

---

[5]*Alabama Power Co.* v. *Alabama Public Service Comm.* (Ala. 1977), CCH Pub. Util. Law Rptr., New Matters.

in his or her utility bill to pay for the utility's donations was not directly before this court in *Franklin Co. Welfare Rights Org., supra.* The issue is now properly before this court, and thus I have had the opportunity to closely examine its resolution in other jurisdictions. An examination reveals that, since 1972, this issue has been addressed in approximately 30 states, not including Ohio.[6] Of those 30 states, 23 have taken the path rejected by the majority and have, in the normal course, refused to allow a public utility to charge its ratepayers for its donations. Only a mere six states, including New York, as noted by the majority, have allowed recoupment of these donations from the utility's consumers.[7] The Illinois Supreme Court, in *Illinois Bell Telephone Co.* v. *Illinois Commerce Comm.* (1973), 55 Ill. 2d 461, 303 N. E. 2d 364, 3 PUR 4th 36, at page 480 of its opinion, noted the commission's reference to *Virtjak* v. *Illinois Bell Telephone Co.* (Ill. 1959), 32 PUR 3d 385, but then held that the utility's charitable contributions were not operating expenses cognizable for the purposes of rate-making. Apparently, none of our neighboring states in the normal course permits a public utility to charge its charitable contributions to its consumers. *Re Indianapolis Power & Light Co.* (Ind. 1975), 9 PUR 4th 86; *Re Union Light, Heat & Power Co.* (Ky. 1953), 97 PUR N. S. 33; *Re Potomac Edison Co. of W. Va.* (W. Va. 1974), 6 PUR 4th 183; *Bainbridge Motor Co.* v. *General telephone Co. of Pa.* (Pa. 1975), 12 PUR 4th 416; *Re Detroit Edison Co.* (Mich. 1970), 83 PUR 3rd 463.[8]

I wish at this point to emphasize that I am *not* urging that utilities be prohibited from making contributions but only that they be precluded from charging them against their ratepayers. Furthermore, I have no doubt as to the importance of these contributions to the donees, or that these donations are devoted to beneficial uses. I do believe,

---

[6] 3 PUR Digest, 2d Series, 1977 Supp., Expenses, Section 46.

[7] Conflict apparently exists between the Supreme Court of Washington and the commission with regard to this issue.

[8] Contra: *Re Michigan Bell Telephone Co.* (Mich. 1975), Case No. U-4575.

however, that it is grossly improper to permit a utility to charge its customers for the utility's charitable contributions.

The Supreme Court of California, in *Pacific Tel. & Tel. Co.* v. *Public Util. Comm.* (1965), 62 Cal. 2d 634, 401 P. 2d 353, held that a utility's attempt to charge all of its own contributions as an operating expense to be borne by the ratepayers was plainly unwarranted. Relying upon the observations of the Public Utilities Commission of California in its decision, the California Supreme Court quoted with approval the following portion thereof, at page 668.

" 'Dues, donations and contributions if included as an expense for rate making purposes, become an involuntary levy on ratepayers, who, because of the monopolistic nature of utility service, are unable to obtain service from another source and thereby avoid such a levy. Ratepayers should be encouraged to contribute directly to worthy causes and not involuntarily through an allowance in utility rates. [Pacific] should not be permitted to be generous with ratepayers' money but may use its own funds in any lawful manner.' "

The Illinois Supreme Court, in *Illinois Bell Telephone Company, supra,* at page 481, stated:

" ** * [W]e conclude that the allowance of such contributions as operating expenses for purposes of rate making constitutes an involuntary assessment on the utility's patrons, and we question the propriety of Bell's being permitted to thus dispense largesse at their expense."

The Colorado Public Utilties Commission, in *Re Mountain States Telephone & Telegraph Co.* (1972), 96 PUR 3d 321, 326, expressed its opinion on this issue as follows:

"Donations and charitable contributions are made purely at management discretion, accrue to the benefit of the corporation and its owners and should be borne by the stockholders rather than ratepayers * * *."

The North Carolina Utilities Commission echoed a similar sentiment in *Re Virginia Electric & Power Company* (1975), 11 PUR 4th 115, wherein it stated, at page 124:

"* * * The commission is of the opinion that charitable and educational donations is [sic] an expense which should be borne by the company's stockholders, not its ratepayers. The ratepayers have no voice in determining to which charities and institutions, if any, the donations are to be made. The ratepayers should not be made involuntary donors to charitable and educational institutions through the payment of electric rates."

In *Re Chesapeake & Potomac Telephone Company of W. Va.* (1977), 22 PUR 4th 197, the utility argued that the charitable contributions were not to enhance the company's image but were made as a result of its obligation to perpetuate the social well-being of the community it services. It, thus, contended that the ratepayer will ultimately benefit from such contributions and therefore they should be included in the cost of service. The West Virginia Public Service Commission responded, at page 205, in the following manner:

"While it is true that such contributions to local service areas do benefit the communities served, they also tend to upgrade the company's public image and therefore work more to the benefit of the utility and its stockholders than to the benefit of the subscribers. Such an undertaking should be financed by the ownership rather than the utility customers and to allow these expenditures to be treated as an item of operating expense would be to require an involuntary contribution by ratepayers to charities which they may or may not otherwise support."

Apart from other jurisdictions, the Ohio Public Utilities Commission (commission), in *East Ohio Gas Co.* v. *Cleveland* (1934), 4 PUR N. S. 433, disallowed the utility's claim as an expense of its contributions to the Cleveland community fund, stating that it is the right of the stockholders to make such contributions if they desire, but that it would be unfair to permit them to be reimbursed for such expenditures from the customers of the company, who may have already been contributing to the same cause. Adhering to this same principle, the commission again rejected the utility's contention that donations

were operating expenses in *Re Springfield Gas Co.* (1937), 19 PUR N. S. 1, stating at page 17:

"\* \* \* It has been universally held that donations to charitable and religious institutions and to civic organizations and clubs \* \* \* while evidence of the company's interest in public welfare and the upbuilding of the community and its participation in public activities, are to come out of surplus and not chargeable to the ratepayers through the medium of operating expenses. It is generally recognized that ratepayers themselves are likewise making similar contributions."

The commission has not been steadfast in its deviation from these prior decisions. In *Re Cleveland Electric Illuminating Co.* (1973), 3 PUR 4th 259, the commission recognized that it had not established a clear precedent as to the allowance or disallowance of charitable contributions as an appropriate item of expense for rate-making purposes. Cognizant of its earliest decisions wherein such donations were disallowed, followed by a period wherein such contributions were an allowable expense, the commission in that cause found that of the $636,149 of charitable contributions during the test year only $300,000 was to be allowed for rate-making purposes. The commission then concluded its discussion on this subject, at page 274, with the following remarks:

"Moreover, we hereby signal the industry that we are moving towards a policy decision that charitable contributions should *not* be included at all as an appropriate item for rate base purposes."

It is evident that the commission has in recent years, for reasons not clearly expressed, never implemented the rule it announced in 1973. See *Re Ohio Bell Telephone Co.* (1976), 15 PUR 4th 344.

This issue is a matter of first impression before this court. Given the apt reasoning expressed in other states for disallowing a utility's attempt to charge its own contributions to its customers, the early decisions of Ohio which similarly refused to consider these donations for rate-making purposes and unjustified oscillation of the

commission since its early decisions on this issue which has been repeatedly and consistently raised by concerned consumers, I am constrained to conclude that the charitable contributions of a utility, a monopoly with a guaranteed fair rate of return, should not be involuntarily borne by the consumer, who cannot obtain this service from another source, but should instead be the responsibility of the utility's shareholders, who not only control the company but share in its guaranteed profits. Moreover, in light of the General Assembly's recent concern with utility rates, as is readily discernible from its discarding of the old RCNLD standard (see my dissent in *Akron* v. *Pub. Util. Comm.* [1978], 55 Ohio St. 2d 155) and its recent establishment of the Public Utilities Commission Consumers' Counsel, R. C. Chapter 4911, the majority's opinion clearly is contra to the implied intentions of the General Assembly.

I am further in disagreement with the majority's summarily affirming the commission's action of severing the cases involving the municipalities and unincorporated areas. Despite protestations that its decision with respect to these two causes in approving uniform rates and the nine cent earnings erosion adjustment did not automatically deny the city of Cincinnati a different rate or a lower erosion adjustment, the plain facts are that the commission eventually approved both the nine cent earnings erosion adjustment and the uniform rate in the cause involving Cincinnati. Having dwelt on the issue of charitable contributions in such an extended manner, I will not attempt an in-depth analysis of this facet of the instant cause. I believe it is sufficient to state that these actions of the commission have the appearance of impropriety and, when combined with the highly technical parlance of engineering and accounting inherent within a rate case, this court should not so lightly grant its *imprimatur*.