CITY OF CLEVELAND, APPELLANT, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.
SENIOR CITIZENS COALITION ET AL., APPELLANTS, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as Cleveland v. Pub. Util. Comm. (1980),
63 Ohio St. 2d  62.]

(Nos. 79-1158 and 79-1173—Decided July 9, 1980.)

*Mr. Thomas E. Wagner,* director of law, and *Mr. Henry W. Eckhart,* for appellant in case No. 79-1158.

*Mr. Joseph P. Meissner,* for appellants in case No. 79-1173.

*Mr. William J. Brown,* attorney general, *Mr. Marvin I. Resnik* and *Ms. Judith B. Sanders,* for appellee.

*Messrs. Squire, Sanders & Dempsey, Mr. Alan P. Buchmann, Mr. Lowell L. Garrett* and *Mr. William C. Donahue,* for intervening appellee Cleveland Electric Illuminating Co.

SWEENEY, J.  Appellants present this court with basically eight alleged errors committed by the commission in reaching its order granting CEI's rate increase. We will proceed to ascertain the reasonableness and lawfulness of the instant order, keeping in mind our often stated scope of review under R. C. 4903.13. See, *e.g., Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108, 110.

I.

Both the city and Senior Citizens contend that the commission erred in allowing CEI's $306 million investment in the Davis-Besse nuclear generating plant to be included in the rate base. Appellants initially assert that because Davis-Besse had not been proven reasonably free from significant design and construction defects, it was not "used and useful" as of the date certain, in accordance with R. C. 4909.15(A)(1). Appellants premise this argument on the fact that the plant was shut down numerous times during the test year and only generated a third of its unit capacity in 1978.[1]

This court has not previously addressed the question of whether a generating plant can be removed from a utility's rate base because it is producing far below its capacity. However, we do note that the Pennsylvania Public Utility Commission recently resolved this issue, although in a some-

---

[1] Since it is uncontroverted that Davis-Besse was producing net electricity for CEI's customers prior to the date certain, this situation is distinguishable from *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 449. Therein, the commission's inclusion of the same unit in Toledo Edison's rate base was reversed by this court, on the basis that the plant had not begun to produce net electricity until after the date certain of September 1, 1977.

what different context. See *Penn. Pub. Util. Comm.* v. *Metro Edison Co.* (1979), 29 P.U.R. 4th 502. Therein, the well-known nuclear accident at Three Mile Island on March 28, 1979, had severely crippled generating unit No. 2. Although unit No. 1 was not damaged, it was also shut down due to "outages." In determining whether either of these units should be removed from the utility's rate base, the Pennsylvania commission, at page 506, listed the following factors as distinguishing unit No. 1 from unit No. 2:

"* * * The length of time which utility plant may be out of service and not be removed from rate base depends upon the nature of the plant, the degree to which the outage can be expected to occur during normal operation of the plant, and the certainty with which resumption of service can be predicted. An example of an outage which will not require a rate base adjustment would be the outage of a generating plant for several weeks for unscheduled maintenance. A generating plant by its nature cannot be operating continuously without periodic maintenance. Outages of several days to several months duration, whether scheduled or forced, are typical of the normal operation of such plant; and the resumption of service is reasonably certain."

Herein, appellee was confronted with a plant in its first full year of operation, described as having "typical startup problems" for a nuclear generating unit. Evidence exists to support appellee's findings that the electricity produced at Davis-Besse created substantial fuel cost savings and helped to alleviate the crisis caused by a national coal strike in 1978. In order to ensure that the additional costs of purchased power, necessitated by the periodic outages at Davis-Besse, would not be built into the rate structure, the commission normalized test year expenses to exclude those costs.

As this court noted in *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 449, 453, "[w]hether property is used and useful in providing service to the customers of a utility is a question which of necessity must be resolved on the basis of a case-by-case analysis." We cannot say that appellee's determination that Davis-Besse was used and useful is manifestly against the weight of the evidence or clearly unsupported by the record.

However, in affirming this finding, we do not wish to leave the impression that even a minute quantity of electricity production will qualify a generating plant for inclusion in the rate base. As appellee itself noted in its instant order, "[i]t is conceivable***that a generating plant could be out of service for such an extended period of time that the commission might properly conclude that it was no longer used and useful, and should therefore be excluded from the utility's rate base."

Alternatively, appellants contend that Davis-Besse should have been excluded from the rate base because it constituted excess generating capacity. The commission is required by R. C. 4905.70 to "establish criteria for the investigation, identification, and remedy of the existence of any excess capacity in the generating systems of electric light companies." In attempting to effectuate this mandate, appellee's staff initially took the actual peak load of CEI and added a fixed 20 percent reserve margin. This sum was then subtracted from the calculated total capability of the CEI system. The resultant excess was greater than the capacity of CEI's share of the Davis-Besse unit. Thus appellants assert that R. C. 4905.70 compels the exclusion of Davis-Besse from the rate base as a remedy for excess capacity. We cannot agree.

As the commission points out, the staff calculations did not take into account the effect of the company's partial, seasonal and conditional deratings on the maximum system capacity.[2] Since utilities must anticipate load growth years in advance to maintain adequate capacity to ensure reliable service, it is unrealistic to expect a utility to have only the precise amount of capacity needed at any given time. The commission recognized this fact in a previous order, *In re Application of Dayton Power & Light Co.* (July 22, 1977), case No. 76-823-EL-AIR, where it noted, at pages 6-7 of its opinion, that "[w]hen capacity greater then [*sic*] that necessary to meet peak needs plus an adequate reserve***is shown to exist, attention must be given to the net effect of such capacity upon the company's total costs before it can be judged whether a

---

[2] These deratings reflect the reality that generating units cannot be operated at maximum capacity for extended periods of time. When the deratings were incorporated into staff calculations the percentage of excess capacity significantly decreased.

facility is useful." There, the commission conducted a cost-benefit analysis to determine "whether or not [a generating unit's] availability will reduce the company's overall cost of service and thereby reduce the rates paid by the electric consumer. If such a unit does serve to reduce the net cost of providing electric service, the property should be considered useful absent other overriding or compelling considerations." *Id.*, at page 6.

It appears to this court that such an analysis is not only appropriate to a determination of excess capacity, but would also be helpful in quantifying a point at which a generating unit can no longer be considered used and useful because of inadequate production performance. The cost-benefit analysis conducted herein showed that the availability of the Davis-Besse plant did result in substantial savings to CEI's customers. Thus, appellee's inclusion of that nuclear generating unit in CEI's rate base is affirmed.

## II.

Except for the preceding question of whether the Davis-Besse plant was properly includable in the rate base, the city and Senior Citizens present distinctly different propositions of law. We will first consider those raised by the city in case No. 79-1158.

## A.

Appellant first contests the commission's inclusion of a $3.05 customer charge in CEI's residential rate schedules. This flat monthly charge, which was first proposed by the commission staff, was designed to reflect the fact that costs are incurred as a result of having customers on line, irrespective of usage considerations.

The city argues that appellee abused its discretion in devising such a charge, citing *Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403. Therein, at paragraph six of the syllabus, we stated that, "[w]hen considering an application for a rate increase filed by a public utility, the Public Utilities Commission may not extend its inquiry to matters not put in issue by the applicant and not related to the rates which are the subject of the application." Appellant's contention that the customer charge is unrelated to the rates

in question is untenable. The costs recovered by this charge are part of the costs of providing electric service. While this component was previously built into the rate per volume, here appellee merely decided to allow CEI to recover it by way of a flat charge.[3]

## B.

The city next challenges the commission's allowance of $150,000 for rate case expenses. Specifically, appellant asserts that CEI did not present evidence to substantiate a $100,000 expense for attorney fees. This proposition of law is not well-taken. As stated in *Cincinnati* v. *Pub. Util. Comm.* (1950), 153 Ohio St. 56, paragraph five of the syllabus, "[w]here a part of rate-case expense must be estimated by the commission, it may exercise sound judgment based on past experience in so doing, and if the computation made does not transcend reasonable bounds, a reviewing court will not ordinarily disturb the amount arrived at, especially where the impact of such allowance on the rates fixed is trivial."

## C.

Finally, the city attacks CEI's energy conservation rate as violative of both R. C. 4905.33 and 4905.35, in that it charges a different rate for "a like and contemporaneous service under substantially the same circumstances and conditions," and gives an "undue or unreasonable preference or advantage" to the customers who receive this special rate. This lower residential rate, which was included in CEI's prior tariffs, is available to any customer whose home meets certain insulation and energy conservation standards specified by the utility.

Obviously, not all rate differentiations are unlawful. In fact, R. C. 4905.31(D) authorizes "[a] classification of service based upon the quantity used, the time when used, the purpose for which used, the duration of use, and *any other reasonable*

---

[3] The city also alleges that R. C. 4909.19 was not complied with, since no notice of the proposed charge was included in CEI's published application. However, appellant's application for rehearing before the commission did not assert any lack of notice. R. C. 4903.10 provides, in pertinent part, that "[n]o party shall in any court urge or rely on any ground for reversal, vacation, or modification not so set forth in said application." Thus, we find that this issue is not properly before this court. See, also, *Agin* v. *Pub. Util. Comm.* (1967), 12 Ohio St. 2d 97.

*consideration."* (Emphasis added.) See *Cleveland Elec. Illuminating Co., supra,* at paragraph ten of the syllabus.

When one considers that appellee is under an obligation, created by R. C. 4905.70, to "initiate programs that will promote and encourage conservation of energy***," the allowance of a rate which fosters that goal cannot be deemed unreasonable or unlawful.

### III.

Appellants, Senior Citizens, present the remaining propositions of law in case No. 79-1173.

### A.

Appellants initially challenge the commission's allowance of over $51 million for construction work in progress (CWIP). Senior Citizens allege that R. C. 4909.15(A)(1) is an unconstitutional delegation of legislative authority in that it provides no standards for appellee's exercise of discretion in granting an allowance for CWIP. This issue was recently decided in *Consumers' Counsel* v. *Pub. Util. Comm., supra* (58 Ohio St. 2d 108),[4] at page 113, where we observed that the following guidelines controlled the commission's discretion: "***[T]he commission must determine by inspection that CWIP is at least 75 percent complete before an allowance can be considered; and the amount of CWIP includable in the rate base cannot exceed 20 percent of the total valuation of the rate base. CWIP allowances must also be reasonable." Having so recently upheld the constitutionality of this section, we find appellants' contention to be without merit.

Senior Citizens alternatively aver that appellee abused its discretion under R. C. 4909.15(A)(1) by approving an allowance for CWIP without requiring a showing of special need, such as cash flow problems. The commission herein limited the CWIP allowance to those projects which would be in service by the end of the test year. This same limitation was sanctioned in *Consumers' Counsel, supra,* at page 112, as bearing "a reasonable relationship to the purpose of the

---

[4] The syllabus therein declares that "[t]he discretion granted the Public Utilities Commission under R. C. 4909.15 to authorize a reasonable allowance for construction work in progress in a utility's rate base constitutes a lawful delegation of the state's police power by the General Assembly."

legislation." Having found that this method normally ensures the reasonableness of a CWIP allowance, this court sees no reason to require an additional showing of cash flow problems.

## B.

Appellants next assert that the commission may not cause a shift in the existing revenue allocation among customer classes without a prior cost-of-service study. The approved rates slightly shifted revenue responsibility from commercial to residential and industrial users. This court has previously found "no statutory requirement in R. C. Chapters 4905 and 4909 as to the necessity of the commission making cost of service determinations relative to specific rate classifications." *Globe Metallurgical* v. *Pub. Util. Comm.* (1974), 40 Ohio St. 2d 40, 41. Since appellants have not demonstrated that this shift was unreasonable, the commission's determination in this regard will not be disturbed.

## C.

Senior Citizens also attack appellee's retention of a declining block rate structure in CEI's winter schedule. This structure provides a lower charge for high use customers, specifically those with consumption over 1000 kilowatts. The commission's staff recommended elimination of declining blocks for summer rates; and, while it also preferred a uniform winter rate, it felt that the resulting impact on high use customers would be too sudden. Therefore, it recommended the retention of a declining block form for winter rates, but with fewer consumption blocks and charges. While appellee's acceptance of this recommendation cannot be deemed unreasonable, this court would note that the continued existence of a declining block structure does not promote energy conservation. Thus, in order to comply with R. C. 4905.70, the commission should continue its efforts to eliminate declining blocks.

## D.

Finally, Senior Citizens contend that appellee's allowances for two expense items were unreasonable and unlawful. Specifically, the commission approved allowances of $1,880,508 for advertising expenses and $459,190 for charitable contributions.

The commission's authority to allow a utility to recover operating expenses through its rate schedules is found in R. C. 4909.15(A)(4), which provides, in part, that the commission shall determine "[t]he cost to the utility of rendering the public utility service for the test period." Our task upon review is to determine whether appellee could reasonably and lawfully conclude that the instant expenses were related to the cost of rendering the public utility service. We begin with the advertising expenses.[5]

### 1.

Traditionally, the allowance of advertising expenses as a "cost of rendering service" has been premised on a view that the ads benefit consumers by ultimately lessening the expense of doing business. See, *e.g., New England Tel. & Tel. Co.* v. *Dept. of Pub. Util.* (1971), 360 Mass. 443, 482, 275 N.E. 2d 493. While in the past this rationale was accepted almost without comment, there has been a recent trend, amplified by the energy crisis and spiraling inflation, toward more careful scrutiny of certain types of advertising to determine whether they primarily benefit the consumers or the shareholders.[6]

Utilities engage in basically four types of advertising: (1) *institutional,* which is "designed to enhance or preserve the corporate image of the utility, and to present it in a favorable light***";[7] (2) *promotional,* which is "designed to obtain new utility customers, to increase usage by present customers, or to encourage***one form of energy in preference to another***";[8] (3) *consumer* or *informational,* which is "designed to inform the consumer of rates, charges and conditions of service, of benefits and savings available to the consumer; of proper safety precautions and emergency procedures and similar matters***";[9] and (4) *conservation,*

---

[5] Proper advertising expenses were first found to be includable as an item of operating expense in *Columbus* v. *Pub. Util. Comm.* (1950), 154 Ohio St. 107, paragraph seven of the syllabus.

[6] See Note, Public Utilities: The Allowance of Advertising Expenditures for Rate-Making Purposes—Is This Trip Really Necessary? 29 Okla. L. Rev. 202 *et seq.*

[7] *Re Promotional Practices of Pub. Util. & Co-op Util. Assns.* (Okla. 1972), 97 P.U.R. 3d 1, 4.

[8] *Id.*

[9] *Id.*

which is "designed to inform the consumer of the means whereby he can conserve energy and reduce his usage, and seeks to encourage him to adopt those means."[10]

It is obvious that the informational and conservation categories of advertising provide direct, primary benefits to consumers. As stated in *Los Angeles* v. *Pub. Util. Comm.* (1972), 7 Cal. 3d 331, 351, 497 P. 2d 785, "[a]dvertising which is properly classified as informative results in more than a mere fostering of goodwill. It should result in reduction of operating costs and more efficient service to the ratepayer."

It is not so readily apparent that institutional and promotional advertising provide similar benefits. Recently, appellee has adopted a policy of disallowing promotional advertising expenses.[11] Considering the fact that such ads encourage energy usage at a time of serious energy shortages, it is difficult to envision how they could provide sufficient benefits to consumers to outweigh their costs.

The value to the average consumer of institutional advertising is equally subject to question. The argument against allowance of such ads was cogently presented in Note, Public Utilities: The Allowance of Advertising Expenditures for Rate-Making Purposes—Is This Trip Really Necessary? 29 Okla L. Rev. 202, 209 (1979), as follows:

"***The argument in favor of such advertising***says that by enhancing its corporate image the utility attracts more investment dollars and is hence able to provide better service to its subscribers. However, the question of whose is the greater benefit remains. The boon to the corporate stockholder is readily apparent but the gain of the rate-paying consumer is demonstrable only by reference to a vague and tenuous causal chain somehow leading to superior performance. Furthermore, the efficacy of and necessity for institutional advertising as a means to attract investment capital is uncertain. First, a simple profit-loss statement***provides potential investors with more information they are likely to consider relevant than does published corporate self-congratulation. In addition, when a company enjoys a virtual

---

[10] *Id.*

[11] *In re Application of Dayton Power & Light Co.* (August 25, 1976), case No. 74-823-Y.

monopoly in the supply of a necessary and valuable product***it is likely to remain a sound investment, or at least will not be made more so by institutional advertising. Thus, it can be seen that the benefit to the consumer from the institutional advertising by public utilities is usually not sufficient to require him to subsidize its costs." See, also, *Illinois Bell Tel. Co.* v. *Illinois Commerce Comm.* (1973), 55 Ill. 2d 461, 479, 303 N.E. 2d 364.

In recognition of its questionable benefit to ratepayers, state regulatory commissions have almost uniformly disallowed institutional (as well as promotional) advertising as a recoverable operating expense in recent years. See, *e.g., Re Arkansas-Missouri Power Co.* (Ark. 1977), 22 P.U.R. 4th 493; *Re General Tel. Co. of California* (Cal. 1977), 21 P.U.R. 4th 179; *Re Mountain States Tel. & Tel. Co.* (Colo. 1977), 22 P.U.R. 4th 516; *Re Georgia Power Co.* (Ga. 1979), 30 P.U.R. 4th 409; *Re Laclede Gas Co.* (Mo. 1978), 25 P.U.R. 4th 51; *Re Northern States Power Co.* (N.D. 1978), 24 P.U.R. 4th 252; *Re Otter Tail Power Co.* (S.D. 1979), 30 P.U.R. 4th 26; *Re Monongahela Power Co.* (W. Va. 1978), 25 P.U.R. 4th 449; and *Re Montana-Dakota Utilities Co.* (Wyo. 1977), 21 P.U.R. 4th 65.

A characteristic of such advertising which distinguishes it from other expenses was aptly described in *Re Iowa Pub. Serv. Co.* (Iowa 1972), 96 P.U.R. 3d 1, 20, as follows: "Such other expenses usually entail the expenditure of funds for presumptively necessary items, which expenditures once having been made place a burden on anyone opposing their allowance to show precisely why they should not be considered a proper operating expense.***Institutional advertising on the other hand is designed to benefit the owners of the company by projecting a favorable image of its operations.

"***As a consequence, barring other considerations, we would deny the institutional expense as a legitimate part of a company's cost of service unless unusual circumstances were shown***." A similar presumption against allowance of institutional and promotional advertising was adopted in *State* v. *Oklahoma Gas & Elec. Co.* (Okla. 1975), 536 P. 2d 887.

This court is of the opinion that this same presumption must be applied by appellee, if operating expenses are truly to

reflect "the cost of rendering the public utility service." Therefore, institutional and promotional advertising expenses are to be disallowed, unless the utility can clearly demonstrate a direct, primary benefit to its customers from such ads.

Applying this presumption to the instant facts, this court finds the commission's allowance of nearly $1.9 million for advertising expenditures to be unreasonable and unlawful. The record indicates that the primary objective of CEI's advertising plan was to sway public opinion in its favor. Over two-thirds of its mass media budget was allocated for ads designed to bolster consumer appreciation of the company's services and develop acceptance of its rates. Other advertising objectives were: to promote nuclear power, to present CEI as a responsible corporate citizen, to present its point of view regarding environmental regulation, and to preserve its right to pass on its advertising costs. The commission approved all but $23,911 of CEI's proposed advertising expenses, without requiring it to demonstrate that any of these expenditures primarily benefited its customers, as opposed to its corporate image. This cause must therefore be remanded to the commission for a determination of which advertising expenses really were a cost of rendering the public utility service.

### 2.

Applying this same standard to charitable contributions, this court finds that this item also cannot be sustained as a proper operating expense. While we recognize that this holding deviates from our decision in *Cincinnati* v. *Pub. Util. Comm.* (1978), 55 Ohio St. 2d 168, 173, this court is persuaded by the record in the instant cause and by Justice Locher's well-reasoned dissent in *Cincinnati, supra,* that such contributions are not a cost of rendering the public utility service.

As Justice Locher observes, at page 178, in his dissent, the vast majority of jurisdictions that have recently addressed this question have not allowed utilities to recover such expenses, primarily on the basis that otherwise such contributions become an involuntary levy upon the ratepayers. See, e.g., *Pacific Tel. & Tel. Co.* v. *Pub. Util. Comm.* (1965), 62 Cal. 2d 634, 401 P. 2d 353; *Southern New England Tel. Co.* v. *Pub. Util. Comm.* (1970), 29 Conn. Supp. 253, 282 A. 2d 915; *Il-*

linois Bell Tel. Co. v. *Illinois Commerce Comm., supra; Central Maine Power Co.* v. *Pub. Util. Comm.* (1957), 153 Me. 228, 136 A. 2d 726; and *State* v. *Oklahoma Gas & Elec. Co., supra.*[12]

This court does not doubt the laudable purposes served by such contributions and we sincerely hope utilities will see fit to continue such efforts of their own accord. However, the benevolent nature of such activity should not obscure the fact that it is the utility's management, not the ratepayers, which decides which groups shall receive this bounty.[13] It was aptly noted in *Re Chesapeake & Potomac Tel. Co. of W. Va.* (W. Va. 1977), 22 P.U.R. 4th 197, 205, that "[w]hile it is true that such contributions to local service areas do benefit the communities served, they also tend to upgrade the company's public image and therefore work more to the benefit of the utility and its shareholders than to the benefit of the subscribers. Such an undertaking should be financed by the ownership rather than the utility customers * * *."

In an era when acute energy shortages exist and unavoidable costs of service continually rise, the commission must be particularly cognizant of areas of expense that are not reasonably necessary to provide safe, reliable service to utility customers. By so ensuring that rates increase no more than necessary to maintain a utility's financial integrity, appellee is more likely to foster public confidence in that utility than any amount of corporate self-image building could accomplish.

For the foregoing reasons, the order of the commission is affirmed in part and reversed in part, and this cause is remanded to the commission so that it may recalculate CEI's allowable operating expenses, excluding therefrom charitable contributions and advertising expenditures which did not primarily benefit its customers.

*Judgment accordingly.*

CELEBREZZE, C. J., and W. BROWN, J., concur.

---

[12] Accord, P.U.R. 4th, Annual Digest 1978, Expenses, Section 46.

[13] Herein, CEI established the Cleveland Electric Illuminating Co. Foundation, whose members were all either employed by or on the board of trustees of CEI. The foundation's purpose was to receive donations from CEI and disburse them to charitable groups. At the time of the hearing below, the foundation held assets in excess of two million dollars.

HERBERT, P. BROWN, LOCHER and HOLMES, JJ., concur in part and dissent in part.

HERBERT, J., dissenting in part. The majority legislates a "direct, primary benefit" test which does not appear in R. C. 4909.15. In my opinion, this opens the door to a flood of litigation regarding all public utility operating and administrative expenses, not just those confined to advertising and charitable contributions. The General Assembly is quite capable of adjusting its delegation of authority in this field, and is equipped to investigate all aspects of proposed changes before they become law.

I concur with the majority in the other phases of these causes.

P. BROWN, J., concurs in the foregoing opinion.

LOCHER, J., concurring in part and dissenting in part.

Today's decision, regarding advertising expenses and charitable contributions, is a step forward in the regulation of public utilities in order that they operate for the direct and primary benefit of consumers. I have filed dissenting opinions in numerous public utility cases before this court. See, *e.g., Duff Truck Line* v. *Pub. Util. Comm.* (1977), 51 Ohio St. 2d 4, 9; *Franklin Co. Welfare Rights Org.* v. *Pub. Util. Comm.* (1978), 55 Ohio St. 2d 1, 16; *Akron* v. *Pub. Util. Comm.* (1978), 55 Ohio St. 2d 155, 162; *Cincinnati* v. *Pub. Util. Comm.* (1978), 55 Ohio St. 2d 168, 177; *Columbus* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 103, 106. This is due to my concern that a utility company "is a quasi-public corporation and has possessed a virtual monopoly***. The public interest increases with a monopoly, for, as such, its actions are not regulated by the strictures of the market place." *Central State University* v. *Pub. Util. Comm.* (1977), 50 Ohio St. 2d 175, 180 (Locher, J., dissenting). The commission, the General Assembly, and this court must make certain that a utility company is properly regulated for the primary benefit of consumers.

For the reasons set out in my dissent in *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108, 117, I must respectfully dissent from that portion of the majority

opinion labeled section III A, dealing with construction work in progress (CWIP).

HOLMES, J., concurring in part and dissenting in part. I concur in the opinion in case No. 79-1158, and concur in the opinion in case No. 79-1173 other than that portion which holds that the advertising costs and charitable contributions may not be considered by the utilities as operating expenses.

If it is the policy of this state to eliminate these types of expenses as not being proper under Ohio law, and not a proper "cost of rendering service," such a policy should be voiced and discussed within the General Assembly and appropriate guidelines established for such a policy.

In my view, this court should not further legislate in this area of the law.