Citywide Coalition for Utility Reform, Appellant, v. Public Utilities Commission of Ohio et al., Appellees.

[Cite as Citywide Coalition for Util. Reform v. Pub. Util. Comm. (1993),    Ohio St.3d    .]

Public Utilities Commission -- Electric companies -- Rate increase -- Commission's retention of declining block rate structure and decision to consider the issue again in electric company's next rate case not unreasonable or unlawful, when.

(No. 92-2078 -- Submitted June 2, 1993 -- Decided November 3, 1993.)

Appeal from the Public Utilities Commission of Ohio, No. 91-410-EL-AIR.

On April 2, 1991, intervening appellee Cincinnati Gas & Electric Company ("CG&E") filed an application with appellee Public Utilities Commission ("commission") seeking to increase its rates for electric service. In the application, CG&E proposed to retain its winter declining block rate structure, under which residential rates decrease for usage over one thousand kilowatt-hours ("kWh") per month.1

Appellant Citywide Coalition for Utility Reform ("CCUR") intervened below, contending that the declining block rate was not cost-justified. It recommended that the differential between the two winter blocks be reduced by one half in this proceeding, and be completely eliminated in CG&E's next rate case.

The commission agreed that the rate structure was "not necessarily cost-based," but retained it to prevent the already significant rate increase imposed in this case from having a disproportionate impact on the company's space-heating customers. The commission also ordered CG&E to conduct further analyses on this issue for presentation and consideration in its next rate case.2

On July 2, 1992, the commission denied CCUR's request for rehearing on this issue. The cause is now before this court upon an appeal as of right.

Legal Aid Society of Cincinnati, Jennifer L. Branch and Frank J. Wassermann, for appellant.

Lee I. Fisher, Attorney General, James B. Gainer, Duane W. Luckey, Thomas W. McNamee and Kaye Pfister Willi, Assistant Attorneys General, for appellee.

James J. Mayer and Michael A. Gribler; Squire, Sanders & Dempsey, Alan P. Buchmann, Arthur E. Korkosz and Lisa R. Battaglia, for intervening appellee, Cincinnati Gas & Electric Company.

Per Curiam. CCUR argues that a non-cost-based declining block rate structure does not promote energy conservation and must be eliminated under the Public Utilities Regulatory Policies Act of 1978, Section 2601 et seq., Title 16, U.S. Code ("PURPA") and R.C. 4905.70.3

CCUR's reliance on the declining block standard proposed by PURPA is clearly misplaced. The commission is not required to adopt or implement that standard (Fed. Energy Regulatory Comm. v. Mississippi [1982], 456 U.S. 742, 749-750, 102 S.Ct. 2126, 2132, 72 L.Ed.2d 532, 540-541; Greater Cleveland Welfare

Rights Org., Inc. v. Pub. Util. Comm. [1982], 2 Ohio St.3d 62, 67, 2 OBR 619, 623-624, 442 N.E.2d 1288, 1294), and has not done so. See In re Cincinnati Gas & Elec. Co. (Mar. 18, 1981), PUCO No. 80-260-EL-AIR, 42 PUR4th 252, 302-304.

Nor have we construed R.C. 4905.70 so as to require the elimination of declining block rates in this proceeding. CCUR relies on our decision in Cleveland v. Pub. Util. Comm. (1980), 63 Ohio St.2d 62, 69, 17 O.O.3d 37, 42, 406 N.E.2d 1370, 1377, in which we observed that declining block rates generally do not promote energy conservation and encouraged the commission to continue its efforts to eliminate such rate structures "in order to comply with R.C. 4905.70." However, we held that it was reasonable to retain the structure in that case, based upon the commission's judgment that its elimination would have too sudden an impact on high-use customers.

Here, CCUR argues that there is no evidence in the record to show the extent to which space-heating customers will be harmed by the adoption of its proposal, or even the extent to which they use in excess of one thousand kWh of electricity per month. We disagree.

CCUR's own witness testified that the winter tail block has "a very large effect" on space-heating customers, and that CCUR's proposal would increase the winter tail rate by seventy-three percent in this case. CCUR faults the commission's reliance on the seventy-three-percent figure, noting that it was based on CG&E's requested twenty-five-percent revenue increase. It asserts that, because the commission's order reduced CG&E's requested increase to approximately seventeen percent, the increase to the winter tail rate would be proportionately reduced to approximately fifty percent.

In addition, CCUR claims that it is more appropriate to consider its proposal's effect on large-use customers' bills, rather than just the percentage increase to the winter tail rate. It contends that the average increase to residential winter bills in this case is 33.38 percent and that under its proposal, the increase to large-use customers' winter bills would be 44.8 percent. CCUR argues that this deviation from the average (thirty-four percent) is reasonable, considering that the commission approved an even larger deviation (forty percent) in its inter-class revenue distribution.4 There, CCUR contends rates for residential customers were increased by 16.32 percent while the average increase for all customer classes was 11.61 percent.

We have afforded the commission considerable discretion in matters of rate design, and will not reverse a determination based on its judgment absent a showing that it is against the manifest weight of the evidence, and is so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty. Gen. Motors Corp. v. Pub. Util. Comm. (1976), 47 Ohio St.2d 58, 66, 1 O.O.3d 35, 40, 351 N.E.2d 183, 189; Indus. Protestants v. Pub. Util. Comm. (1956), 165 Ohio St. 543, 60 O.O. 498, 138 N.E.2d 398; MCI Telecommunications Corp. v. Pub. Util. Comm. (1988), 38 Ohio St.3d 266, 268, 527 N.E.2d 777, 780.

The record clearly shows that space-heating customers (and all other residential customers) will experience a significant

rate increase in this proceeding, even without the adoption of CCUR's proposal.  That such proposal would have an additional and significant effect on large-use customers, including space heating customers, is also evident from the record, and even by CCUR's own testimony and arguments.  Accordingly, we cannot find the commission's retention of that rate structure in this case, and its decision to consider this issue again in CG&E's pending rate case, to be unreasonable or unlawful.

Order affirmed.

Moyer, C.J., A.W. Sweeney, Douglas, Wright,  Resnick, F.E. Sweeney and Pfeifer, JJ., concur.

FOOTNOTES

1    Specifically, under CG&E's residential rate structure, the per kilowatt-hour ("kWh") rate for all summer usage (June through September) remained constant, and the rate for non-summer service (October through May) was divided into two blocks.  The rate in the first block (for usage under one thousand kWh per month) was the same as the summer rate, and the rate in the second ("winter tail") block, for additional usage over one thousand kWh per month, was lower.

2    CG&E has complied with the commission's order in its rate case currently pending before the commission.

3    The purpose of PURPA is "to encourage  --
     " (1) conservation of energy supplied by electric utilities;
     "(2) the optimization of the efficiency of use of facilities and resources by electric utilities; and
     "(3) equitable rates to electric consumers."  Section 2611, Title 16, U.S. Code.
     To meet these goals, PURPA establishes various standards (e.g., for declining block rates, seasonal rates and lifeline rates) for state regulatory authorities to consider.  Declining block rates are generally subject to criticism as promoting wasteful consumption of electricity (see Gen. Motors, infra) and PURPA proposes their elimination unless they are shown to be cost-justified:
     "The energy component of a rate, or the amount attributable to the energy component in a rate, charged by any electric utility for providing electric service during any period to any class of electric consumers may not decrease as kilowatt-hour consumption by such class increases during such period except to the extent that such utility demonstrates that the costs to such utility of providing electric service to such class, which costs are attributable to such energy component, decrease as such consumption increases during such period." Section 2621(d)(2), Title 16, U.S. Code.
     Similar to PURPA, R.C. 4905.70 provides in part:
     "The public utilities commission shall initiate programs that will promote and encourage conservation of energy and a reduction in the growth rate of energy consumption, promote economic efficiencies and take into account long-run incremental costs. * *  * [T]he public utilities commission shall examine and issue written findings on the declining block rate structure, lifeline rates, long-run incremental pricing, peak load and off-peak pricing, time of day and seasonal pricing, interruptible load pricing, and single rate pricing

where rates do not vary because of classification of customers or amount of usage."

4   Broadly speaking, the inter-class revenue distribution determines the contribution that each customer class must make to satisfy the utility's revenue requirement as determined under R.C. 4909.15(B).